327 S.E.2d 416

The **BOARD OF EDUCATION OF the COUNTY OF HANCOCK**

v.

E. Russell **SLACK,** as Secretary of the Board of Education of the County of Hancock.

No. **16555.**

Supreme Court of Appeals of West Virginia.

March 1, 1985.

James K. Brown, Lee O. Hill, Taunja Willis, Jackson Kelly, Holt & O'Farrell, Charleston, for appellant.

Robert R. Harpold, Jr., Charleston, for appellee.

MILLER, Justice:

In this original mandamus action, we are asked to require the Secretary of the Hancock County Board of Education to perform certain nondiscretionary duties in connection with refunding bonds proposed by the Board pursuant to our Refunding Bond Act,[1] W.Va.Code, 13–2–1 through –9.[2] The Secretary has refused to act, contending that the refunding of bonds violates the applicable statutes, Article X, Sections 8 and 10 of the West Virginia Constitution, which relate to county, municipal, and school bonded indebtedness, and the mandate of the voters who approved the issuance of the general obligation bonds, which are to be refunded. The primary purpose of this litigation is to test the validity of the proposed refunding bond plan so that the bonds can be issued and marketed.

Both parties agree that if we find that the Board's refunding bond plan meets the constitutional and statutory requirements and does not conflict with the initial authorization approved by the voters, then mandamus will lie to direct the Secretary to execute the required documents. This procedure is in line with our other bond cases, where we have held that once it is deter-

---

**1.** In 1984, W.Va.Code, 13–2–1, –2 and –4 were amended. Any citations of these three sections of our Refunding Bond Act in this opinion will be to the 1984 amended versions of these sections unless otherwise indicated. *See* note 14, *infra.*

**2.** Specifically, we are asked to require the Secretary to: (1) execute and deliver the Board's letter to the Secretary of State, which offers the refunding bonds to any governmental agency, pursuant to W.Va.Code, 13–2–4; (2) execute and deliver the Board's letter to the Executive Secretary of the West Virginia Municipal Bond Commission (hereinafter Bond Commission), which

requests the withdrawal of the money accumulated from the collection of levies for the original bonds, pursuant to the plan outlined in the refunding resolution; (3) execute and deliver the Board's letter to the Chairman of the Bond Commission, which inquires about the amount of taxes expected to be available for the refunding bonds, pursuant to W.Va.Code, 13–2–1; (4) readvertise the $1,840,000 worth of the original bonds, pursuant to the refunding resolution; and (5) countersign the refunding bonds and the additional original bonds, pursuant to W.Va. Code, 13–2–3, which incorporates the provisions of W.Va.Code, 13–1–19.

mined that a bond issue authorized by a governmental agency is lawful, mandamus will lie to compel the secretary of the agency or other ministerial official responsible for executing the necessary documents to execute such documents. *E.g., State ex rel. Ohio County Comm'n v. Samol,* 165 W.Va. 714, 275 S.E.2d 2 (1980); *State ex rel. County Court v. Kemp,* 151 W.Va. 349, 151 S.E.2d 680 (1966); *State ex rel. County Court v. Demus,* 148 W.Va. 398, 135 S.E.2d 352 (1964). This principle is related to the general rule in mandamus cases that holds that:

> "Mandamus lies to require the discharge by a public officer of a nondiscretionary duty." Syllabus Point 1, *State ex rel. Bache & Co. v. Gainer,* 154 W.Va. 499, 177 S.E.2d 10 (1970).

*See also* Syllabus Point 2, *Reed v. Hansbarger,* 173 W.Va. 258, 314 S.E.2d 616 (1984); *State ex rel. Hughes v. Bd. of Education,* 154 W.Va. 107, 174 S.E.2d 711 (1970); Syllabus Point 1, *State ex rel. West Virginia Housing Development Fund v. Copenhaver,* 153 W.Va. 636, 171 S.E.2d 545 (1969).[3]

The basic facts are not in dispute. The Hancock County Board of Education determined that general obligation bonds were needed to finance school construction and improvements. In an order adopted January 25, 1980 (hereinafter Election Order), the Board scheduled a special election for voter approval of school bonds in the aggregate principal amount of $13,885,000. The Election Order specified an interest rate not to exceed 8 percent per annum for the bonds as well as a maturity schedule of twenty years. The first nineteen annual redemptions would be in the amount of $695,000 a year while the twentieth would be in the amount of $680,000.

The voters approved the bond issue and its accompanying tax levy at a special election on March 28, 1980. However, because of poor economic conditions, the Board was not able to sell any of the bonds until 1983,

when bonds totalling $8,340,000 were sold, leaving $5,545,000 worth of bonds approved at the special election unissued. As of November 15, 1984, the date of the refunding resolution, the outstanding debt on the issued bonds was reduced to $7,645,000, after one annual payment of $695,000 had been made on the original issue of $8,340,-000.[4]

The Board has used the money received from the sale of the bonds for school improvements, but desires to issue these refunding bonds in order to refinance its school bond indebtedness, which will produce additional funds that can be applied to the completion of the school construction program.

The main provisions of the Board's refunding bond proposal can be summarized as follows. First, refunding bonds in the aggregate principal amount of $7,645,000 will be issued, the purchase price of which will be no less than 93 percent of par value, with interest rates ranging from 8 percent per annum to 9.875 percent per annum, maturing annually beginning in 1987 and ending in 1997. Second, the monies acquired through the sale of the refunding bonds will be used to purchase United States Treasury obligations, which will be deposited in an escrow fund created and established with the Bond Commission.

The escrow fund will be used to liquidate the present outstanding school bonds as they mature, which will allow the tax revenues formerly reserved for the payment of the outstanding bonds to be applied to the retirement of the new refunding bonds. Third, $1,840,000 of the remaining $5,545,-000 worth of bonds originally approved by the voters will be readvertised for sale. As a result of the savings achieved through this refunding bond plan, all of the school construction work approved by the voters in the special election will be completed

---

3. For an extensive list of cases reciting this rule, see note 10, *Allen v. State Human Rights Comm'n,* —— W.Va.——, 324 S.E.2d 99, 107–08 (1984).

4. The Board collected its special tax levy authorized at the bond election prior to the sale of

any bonds and deposited this money with the Bond Commission, in accordance with W.Va. Code, 13–3–9. The balance in the Bond Commission account, together with interest, amounts to approximately $3,375,000.

without issuing the remaining $3,705,000 of the original bond issue.

According to the Board, this refunding bond plan provides several major benefits to it and the citizens of Hancock County. With the escrow fund available to liquidate the old outstanding bonds, the approximately $3,375,000 now in the Bond Commission account could be released to complete additional school improvements. The Board estimates that under its plan, the taxpayers will pay approximately $4,312,000 less than under the original school bond plan approved by the voters.

5. The issues raised in this case can be stated as follows:

(1) Do the provisions of the Refunding Bond Act, W.Va.Code, 13–2–1 through –9, authorizing the issuance of refunding bonds without voter approval, violate Article X, Sections 8 and 10 of the West Virginia Constitution?

(2) Does the Board's proposed sale of refunding bonds at a discount with higher interest rates and a different maturity schedule than approved for the original school bonds, violate either the Refunding Bond Act or Article X, Sections 8 and 10 of the West Virginia Constitution or the mandate of the voters who approved the issuance of the original school bonds?

(3) May the proceeds from the sale of the refunding bonds in excess of the amount needed to effect the defeasance of the outstanding original school bonds be used to complete school improvements?

(4) Does the proposed issuance of the $1,840,000 worth of the remaining $5,545,000 in unissued original school bonds violate either Article X, Sections 8 and 10 of the West Virginia Constitution or the mandate of the voters who approved the issuance of the original school bonds?

(5) Do the proposed tax levy rates and debt service under the Board's refunding bond plan violate either the Refunding Bond Act or Article X, Sections 8 and 10 of the West Virginia Constitution or the mandate of the voters who approved the issuance of the original school bonds?

(6) Does the use of the 1980–81 property assessment rather than the 1979–80 assessment included in the Election Order violate the mandate of the voters?

(7) Does the proposed withdrawal of the funds deposited with the Bond Commission that were raised through the collection of taxes under the original school bond plan approved by the voters violate the Refunding Bond Act or the mandate of the voters?

(8) Does the appointment of an out-of-state bank as registrar for the refunding bonds and the $1,840,000 worth of original school bonds violate the applicable statutes or the mandate of the voters?

## I.

## VOTER APPROVAL

There are a number of legal issues addressed by the Secretary and the Board, which are summarized in the margin.[5] The initial issue is whether our Refunding Bond Act, W.Va.Code, 13–2–1 through –9, violates Article X, Sections 8 and 10 of our Constitution, which require voter approval for direct obligation bonds issued by a county, municipality or school board.[6]

■ The Board's position is that since refunding bonds are generally held not to

6. Section 8 of Article X of the West Virginia Constitution provides:

"No county, city, school district, or municipal corporation, except in cases where such corporations have already authorized their bonds to be issued, shall hereafter be allowed to become indebted, in any manner, or for any purpose to an amount, including existing indebtedness, in the aggregate, exceeding five per centum on the value of the taxable property therein to be ascertained by the last assessment for State and county taxes, previous to the incurring of such indebtedness; nor without, at the same time, providing for the collection of a direct annual tax on all taxable property therein, in the ratio, as between the several classes or types of such taxable property, specified in section one of this article, separate and apart from and in addition to all other taxes for all other purposes, sufficient to pay, annually, the interest on such debt, and the principal thereof, within, and not exceeding thirty-four years. Such tax, in an amount sufficient to pay the interest and principal on bonds issued by any school district not exceeding in the aggregate three per centum of such assessed value, may be levied outside the limits fixed by section one of this article: Provided, that no debt shall be contracted under this section, unless all questions connected with the same, shall have been first submitted to a vote of the people, and have received three fifths of all the votes cast for and against the same."

Section 10 of Article X of the West Virginia Constitution provides:

"Notwithstanding any other provision of the Constitution to the contrary, the maximum rates authorized and allocated by law for tax levies on the several classes of property for the support of public schools may be increased in any school district for a period not to exceed five years, and in an amount not to exceed one hundred percent of such maximum rates, if such increase is approved, in the manner provided by law, by at least a majority of the votes cast for and against the same.

create a new indebtedness because they are issued to retire or become a substitute for the original bond issue, voter approval is not necessary for the refunding bonds. We are cited *Keeney v. County Court*, 115 W.Va. 243, 175 S.E. 60 (1934), where we had the question of whether refunding bonds create a new debt and stated in the single Syllabus, quoted in part:

> "The issuance ... of refunding bonds to retire existing ... bonds ... under article 2 of chapter 13 of the Code, does not create a new indebtedness, and levies to provide debt service for the new (refunding) bonds may be laid to the same extent and with like effect as they could have been laid for the original bonds."

We stated in *Keeney* that there was overwhelming authority [7] for the proposition that a refunding bond "is simply a change in the form of the old [debt] and in the evidence representing it." 115 W.Va. at 245, 175 S.E. at 61. There is no question that the majority of jurisdictions still hold that refunding bonds do not create a new indebtedness. *See also Taxpayers and Citizens v. Shelby County*, 246 Ala. 192, 20 So.2d 36 (1944); *Allison v. City of Phoenix*, 44 Ariz. 66, 33 P.2d 927 (1934); *State v. City of Miami*, 155 Fla. 180, 19 So.2d 790, 1 A.L.R.2d 132 (1944); *Veatch v. City of Moscow*, 18 Idaho 313, 109 P. 722 (1910); *State ex rel. St. Charles County v. Smith*, 348 Mo. 7, 152 S.W.2d 1, 135 A.L.R. 625 (1941); *Williams v. City of Rock Hill*, 177 S.C. 82, 180 S.E. 799, 100 A.L.R. 604 (1935);

*Rodin v. State ex rel. City of Cheyenne*, 417 P.2d 180 (Wyo.1966); 64 Am.Jur.2d *Public Securities and Obligations* § 267 (1972). The Secretary cites *Doon v. Cummins*, 142 U.S. 366, 12 S.Ct. 220, 35 L.Ed. 1044 (1892), in which the United States Supreme Court held under an Iowa constitutional provision that refunding bonds used to liquidate original bonds constituted new indebtedness. The New Mexico Supreme Court in *City of Albuquerque v. Gott*, 73 N.M. 439, 442, 389 P.2d 207, 209 (1964), in speaking of *Doon*, stated:

> "[I]t is decidedly a minority view, even to the extent that United States Circuit Courts of Appeal have on numerous occasions distinguished the Doon case (see, for example, City of Huron v. Second Ward Sav. Bank (8th Cir.1898), 86 F. 272, 49 L.R.A. 534), and it has been said by most courts that no new indebtedness is created, particularly where the proceeds of the refunding are applied to municipal indebtedness, annot. 97 A.L.R. 452–457."

The rule that refunding bonds do not create a new debt and, therefore, may be issued without voter approval under Article X, Sections 8 and 10 of the West Virginia Constitution is subject to certain qualifications. First, the amount of refunding bonds cannot increase the total indebtedness authorized by the voters on the original bond issue. Under Article X, Sections 8 and 10 of the West Virginia Constitution, no local governmental authority may issue general obligation bonds

"Notwithstanding any other provision of the Constitution to the contrary, the maximum rates provided for tax levies by school districts on the several classes of property may be used entirely for current expense purposes; and all levies required for principal and interest payments on any bonded indebtedness, now or hereafter contracted, not to exceed five percent on the value of the taxable property therein, the value to be ascertained in accordance with section eight of this article, shall be laid separate and apart and in addition to such maximum rates, but in the same proportions as such maximum rates are levied on the several classes of property.

"Notwithstanding the provisions of section eight of this article relating to a vote of the people or any other provisions of this Constitution, a county board of education may contract indebtedness and issue bonds for public school purposes as provided by law, if, when

submitted to a vote of the people of the county, in the manner provided by law, the question of contracting indebtedness and issuing bonds is approved by a majority of the votes cast for and against the same."

7. In *Keeney,* the following cases are cited: *Hamilton County v. Montpelier Savings Bank & Trust Co.,* 157 F. 19 (7th Cir.1907); *Independent School Dist. v. Rew,* 111 F. 1 (8th Cir.1901); *Bd. of Comm'rs v. Keene Five-Cents Savings Bank,* 108 F. 505 (8th Cir.1901); *Bd. of Comm'rs v. Aetna Life Insurance Co.,* 90 F. 222 (8th Cir. 1898); *City of Huron v. Second Ward Savings Bank,* 86 F. 272 (8th Cir.1898); *Bolich v. City of Winston-Salem,* 202 N.C. 786, 164 S.E. 361 (1932); *Commw. ex rel. Keller v. Cannon,* 308 Pa. 321, 162 A. 277 (1932); *Hirt v. City of Erie,* 200 Pa. 223, 49 A. 796 (1901).

without voter approval.[8] It necessarily follows that once voters have approved of a certain level of bonded indebtedness, this amount cannot be increased through the issuance of refunding bonds without further voter approval. This qualification is noted in *Beaumont v. Faubus*, 239 Ark. 801, 809, 394 S.W.2d 478, 484 (1965), where the court in approving of a refunding bond plan stated: "[T]he power to issue the outstanding bonds in the first instance carried with it the power to refund them without an election so long as the indebtedness is not increased. *Talkington v. Turnbow*, 190 Ark. 1138, 83 S.W.2d 71 [ (1935) ]."[9] Second, refunding bonds ordinarily may not be liquidated over a period longer than authorized for the original bond issue.[10]

■ We recognize that this second qualification, which arises by virtue of W.Va. Code, 13-1-4, is a corollary of the first principle. Under W.Va.Code, 13-1-4, the Election Order must contain certain specified information, such as the maximum term and interest rates on the original bonds. We have rather consistently held that the information relevant to the proposed bonds required to be included in an election order under the provisions of this statute must be substantially complied with or the original bond issue will be invalid. *Baxa v. Partlow*, 132 W.Va. 859, 54 S.E.2d 825 (1949); *State ex rel. County Court v. Partlow*, 130 W.Va. 777, 45 S.E.2d 506, 175 A.L.R. 813 (1947); *Sessler v. Partlow*, 126 W.Va. 232, 27 S.E.2d 829 (1943); *cf. Thomas v. Bd. of Education*, W.Va. 261 S.E.2d

66 (1979); *Lawson v. County Court*, 80 W.Va. 612, 92 S.E. 786 (1917). The constraints of W.Va.Code, 13-1-4, are not specifically imposed under our Refunding Bond Act and, therefore, there is more flexibility as to the terms of refunding bonds. However, we again emphasize that the maturity schedule and interest rates proposed for refunding bonds cannot increase the total indebtedness from that originally authorized by the voters.

■ In this case, we are presented with a financing plan that includes refunding bonds and an additional amount of unissued original bonds. From the foregoing discussion, a third constraint applies which is that the aggregate of the principal and interest payments made on the original bonds prior to their refunding, when added to the amounts to be paid on the refunding bonds and any outstanding original bonds that are issued but not refunded, cannot exceed the original indebtedness authorized by the voters. *Cf. Baxa v. Partlow, supra.*

■ In other words, when the voters initially gave approval of the original bond issue, they were authorizing the issuance of not more than $13,885,000 in school bonds, which were to be liquidated over a period not to exceed twenty years and bear interest at a rate not to exceed 8 percent per annum. Based on these figures, the special property tax levy was also authorized by the voters.[11] The parties agree that this created a total obligation, including principal and interest, of $25,537,-

8. It should be noted that Article X, Section 8 deals with voter approval of general obligation bonds generally, while Article X, Section 10 contains specific provisions for school boards. It is clear from the provisions of Article X, Section 10 of the West Virginia Constitution (*see* note 6, *supra* ) that school boards are not subject to the maximum levy limits set in Article X, Section 1. *See Appalachian Power Co. v. County Court*, 146 W.Va. 118, 118 S.E.2d 531 (1961).

9. In the present case, the refunding bonds do not exceed the principal amount of the bonds to be refunded. We note that W.Va.Code, 13-2-1, appears to permit the issuance of a greater principal amount of refunding bonds than the bonds to be refunded if "the amount of debt service payable on such refunding bonds in each year is equal to or less than the amount of taxes expect-

ed to be available therefor." We express no view on the validity of this provision.

10. Several courts have considered this question in the context of original bonds that were issued with maturity schedules that were somewhat different than those originally approved by the voters. These courts have held that so long as the changes do not increase the total tax burden approved by the voters, the changes would be upheld. *Bd. of Supervisors v. Rechenmacher*, 105 Cal.App.2d 39, 232 P.2d 514 (1951); *State v. City of Miami*, 41 So.2d 888 (Fla.1949); *City of Louisville v. Kesselring*, 257 S.W.2d 599 (Ky. 1953). *See* Part IV(B), *infra.*

11. We note that under W.Va.Code, 13-1-4(*l* ), relating to the contents of the election order that must be published prior to a bond election, that it must state "the approximate rate of levy necessary" to pay the principal and interest on

000, which is to be paid out of the special property tax levy. We believe that as long as the refunding bond plan falls within this amount, it does not require voter approval under Article X, Sections 8 and 10 and does not impinge on the mandate of the voters.[12] For the foregoing reasons, we find that the refunding bond plan does not create new indebtedness and does not violate Article X, Sections 8 and 10 or the mandate of the voters.

## II.

## A.

### HIGHER INTEREST RATES

■ We do not believe that the fact that some of the refunding bonds will bear interest rates higher than the interest rate on the original bonds renders them invalid. It is not disputed that even though some of the refunding bonds will have higher interest rates, these bonds will be liquidated within the original twenty-year period and the taxpayers will be saved over $4 million. In *Rodin v. State ex rel. City of Cheyenne,* 417 P.2d 180 (Wyo.1966), the court approved refunding bonds that had a higher interest rate than the original bonds, mainly on the theory that proceeds from the sale of the refunding bonds would be used to purchase tax-free federal securities, resulting in an overall savings to the taxpayers.[13]

The use of a higher interest rate on refunding bonds is expressly authorized under certain conditions by virtue of W.Va. Code, 13-2-1, which provides that "[s]uch refunding bonds may be issued bearing the same or a higher or lesser rate of interest than the bonds to be refunded." This section, however, limits the setting of a higher interest rate to the extent that the debt service on the refunding bonds cannot exceed the available tax levy originally autho-

---

the bonds. Obviously, the levy rate can only be approximated because over the life of the bonds, the appraised value of the property on which the levy rates are applied may change. Under W.Va.Code, 13-1-20, the bond-issuing authority is required "to pay annually the interest on such debt and the principal thereof falling due in each year, such tax to be levied and collected by the same officers, at the same time and in the same manner as the general taxes of the political division." This would appear to permit annual adjustments to the levy rates, if necessary, to meet the annual bond interest including retirement of principal. This point is discussed in more detail in Part VI, *infra.*

12. We believe the original voter mandate, which arises by virtue of the provisions of W.Va.Code, 13-1-4, that requires the voters to be advised and to approve of the key elements of the original bond issue, determines the maximum amount of indebtedness allowable under a financing plan involving refunding bonds. This indebtedness is calculated by adding to the original principal amount of bonds authorized the accrued interest that would be paid on the original bonds over their maturity, which in this case was $25,537,000. From this total, there must be deducted the amounts of principal and interest paid on the original bond issue to reach the net amount available for the financing plan involving refunding bonds. However, for purposes of defining the constitutional limitation on bonded indebtedness in Article X, Section 10 of our Constitution, which is "not to exceed five percent on the value of the taxable property," this "indebtedness" is limited to the principal amount of the bonds. The universal rule is that

in determining a constitutional limit on bonded indebtedness, only the principal amount of the bonds is considered and not the unaccrued interest payments. *See O'Rear v. Sartain,* 193 Ala. 275, 69 So. 554 (1915); *Metropolitan Water Dist. v. Heilbron,* 167 Cal.App.2d 190, 334 P.2d 33 (1959); *Epping v. City of Columbus,* 117 Ga. 263, 43 S.E. 803 (1903); *People ex rel. Lindheimer v. Hamilton,* 373 Ill. 124, 25 N.E.2d 517 (1940); *Pennington v. Town of Sumner,* 222 Iowa 1005, 270 N.W. 629, 109 A.L.R. 355 (1936); *Dalton v. State Property and Building Comm'n,* 304 S.W.2d 342 (Ky.1957); *Wright v. Stapp-Zoe Consolidated School Dist.,* 190 Okla. 289, 123 P.2d 281 (1942); *Pennsylvania Power & Light Co. v. City of Bethlehem,* 323 Pa. 313, 185 A. 710 (1936); *Chartier Real Estate Co. v. Chafee,* 101 R.I. 544, 225 A.2d 766 (1967); *Williams v. City of Rock Hill,* 177 S.C. 82, 180 S.E. 799, 100 A.L.R. 604 (1935); 15 E. McQuillin, The Law of Municipal Corporations § 41.27 (3d ed. 1970); 56 Am.Jur.2d *Municipal Corporations, Counties, and Other Political Subdivisions* § 622 (1971); Annot., 100 A.L.R. 610 (1936).

13. The court in *Rodin,* 417 P.2d at 197, stated:
 "This objection is based in the premise that the refunding bonds bear an interest rate higher than that provided by certain of the outstanding issues but it fails entirely to take into account that not only is the interest rate on other of the refunded items higher than that of the refunding bonds, but it ignores the fact the interest increment from the federal securities to be purchased with proceeds from the sale of the refunding issues, being tax free, will result in an over-all saving to the City of over two million dollars."

rized.[14] This limiting language is designed to ensure that where refunding bonds are issued at a higher rate of interest, the bonds must still be liquidated within the confines of the original levy authorized by the voters on the original bond issue. It is apparent that this provision focuses on the original levy rates and "the most recent assessed valuation of the property prior to such [original bond] election" is designed to conform the refunding bond plan to the confines of the original indebtedness. As we point out in more detail in Part VI, *infra*, the actual annual levy rates are determined by each year's bond amortization schedule and the current valuation of the property. We, therefore, conclude that under W.Va.Code, 13-2-1, refunding bonds may be issued at a higher rate of interest than existed on the original bonds so long as this does not cause the refunding bond plan to exceed the total indebtedness originally approved by the voters.

## B.

### DIFFERENT MATURITY SCHEDULE

■ The Board's refunding bond plan proposes a maturity schedule that is two years longer than the maturity schedule of the $7,645,000 in outstanding original bonds, which are to reach final maturity in 1995. Furthermore, the annual debt service between the two schedules is somewhat different. The Secretary contends that these variances are improper, but we disagree. First, the refunding bond's maturity schedule is still within the twenty-year maturity schedule authorized by the voters in 1980. Second, the annual debt service on the refunding bonds remains within the amount of the annual tax levy. Thus, the maturity schedule fits within the general guidelines which we have previously sanctioned. There is nothing within the Refunding Bond Act which requires refunding bonds to have the same maturity schedule as the original bond issue. Indeed, it is difficult from a practical standpoint to see how this could be required. Refunding bonds are issued subsequent to and in replacement of the original bonds whose maturity schedule must of necessity have already begun.

■ As we more fully discuss in Part IV(B), *infra*, the general rule is that the

---

**14.** The relevant portion of W.Va.Code, 13-2-1, states:

"Such refunding bonds may be issued bearing the same or a higher or lesser rate of interest than the bonds to be refunded. Except to the extent that additional taxes for such purpose have been approved by the voters and the levy of such additional taxes provided for in the manner stipulated in sections seven through fourteen [§§ 13-1-7 through 13-1-14] of article one of this chapter, no such refunding bonds shall be issued bearing a higher rate of interest than the bonds being refunded ... unless the amount of debt service payable on such refunding bonds in each year is equal to or less than the amount of taxes expected to be available therefor as shall be certified by the chairman of the West Virginia municipal bond commission prior to the issuance of such refunding bonds. The amount of taxes expected to be available in each year for purposes of this section shall be based upon the rates of levy stipulated in the order directing the election at which the issuance of the bonds being refunded was approved by the voters and upon the most recent assessed valuation of the affected property prior to such election."

We note that prior to its amendment in 1984, W.Va.Code, 13-2-1 (1925), required refunding bonds to bear "the same or a lesser rate of interest than the bonds to be refunded." The Secretary does not argue that the 1984 amendment to W.Va.Code, 13-2-1, permitting higher interest rates on refunding bonds, cannot apply to refunding bonds issued to replace a pre-1984 bond issue. A similar argument was made in *Beaumont v. Faubus*, 239 Ark. 801, 394 S.W.2d 478 (1965), where the Arkansas legislature in 1965 had enacted amendments to its refunding bond statute that substantially changed the original provisions. The holders of a 1941 bond issue claimed that the 1965 provisions could not be applied to refund their bonds, but the Arkansas Supreme Court rejected their argument, holding that the application of the amended provisions did not impair the holders' contractual rights. *See also State School Building Finance Comm. v. Betts*, 216 Cal.App.2d 685, 31 Cal.Rptr. 258 (1963); *Harsha v. City of Detroit*, 261 Mich. 586, 246 N.W. 849, 90 A.L.R. 853 (1933). *Cf. Zimmerman v. New Martinsville*, 117 W.Va. 752, 188 S.E. 124, 109 A.L.R. 958 (1936) (Tax Limitation Amendment adopted after bonds authorized but prior to sale applicable to the bonds); Annot., 109 A.L.R. 961 (1937); Annot., 19 A.L.R. 1055 (1922). No issue is raised in this case by the bondholders of the outstanding bonds that the 1984 amendments to our Refunding Bond Act impair their contractual rights.

maturity schedule of bonds may be varied over that which was originally authorized so long as there has been no increase in the indebtedness originally authorized. *Bd. of Supervisors v. Rechenmacher,* 105 Cal. App.2d 39, 232 P.2d 514 (1951); *State v. City of Miami,* 41 So.2d 888 (Fla.1949); *City of Louisville v. Kesselring,* 257 S.W.2d 599 (Ky.1953). We recognize that these cases deal with original bonds, but the same principle is obviously applicable to refunding bonds.

## C.

### SALES AT DISCOUNT

 Much the same answer applies to the question of whether the refunding bonds may be sold at a discount. The Refunding Bond Act is silent as to whether refunding bonds may be sold at a discount. We note that under W.Va.Code, 13–1–21, on an original bond issue, there is the prohibition that "[i]n no event shall bonds be sold for less than their par value." However, the legislature has not seen fit to place this express prohibition in the Refunding Bond Act and, therefore, we conclude that a discount sale of a refunding bond is not prohibited.

 Although the matter has not been touched upon in refunding bond cases, the general rule is that in the absence of some constitutional or statutory prohibition, the right to sell bonds carries with it the right to sell at a discount, i.e., at less than par. *Golden Gate Bridge and Highway Dist. v. Filmer,* 217 Cal. 754, 21 P.2d 112, 91 A.L.R. 1 (1933) (In Bank); *Rowland v. Deck,* 108 Kan. 440, 195 P. 868 (1921); *O'Neill v. Yellowstone Irrigation Dist.,* 44 Mont. 492, 121 P. 283 (1912); *Stone v. City of Hobbs,* 54 N.M. 237, 220 P.2d 704 (1950); *Hattrem-Nelson & Co. v. Salmon River-Grande Ronde Highway Improvement*

*Dist.,* 132 Ore. 297, 285 P. 231 (1930); *City of Lynchburg v. Slaughter,* 75 Va. 57 (1880); *Paine v. Port of Seattle,* 70 Wash. 294, 126 P. 628 (1912); 15 E. McQuillin, The Law of Municipal Corporations § 43.67 (3d ed. 1970); 64 Am.Jur.2d *Public Securities and Obligations* § 232 (1972); Annot., 162 A.L.R. 396 (1946); Annot., 91 A.L.R. 7 (1934).

## III.

### USE OF EXCESS MONEY FROM ESCROW FUND

The Secretary questions whether any excess monies realized from the escrow fund above that necessary to retire or defease the outstanding original bonds may be used for the school improvement program. We answer in the affirmative. The sale of the refunding bonds will result in a sum of money which will be used to buy interest-bearing federal securities that will be placed in escrow with the Bond Commission.[15] These securities will generate income, which will be used to liquidate the outstanding bonds as they mature. If the interest income on the securities in the escrow fund ultimately generates more money when combined with the principal in escrow than is necessary to liquidate the outstanding bonds, it is apparent that any excess balance should be applied to the school improvement project, which is the purpose for which the bonds were originally authorized.

The Secretary argues that W.Va.Code, 13–2–4, appears to limit the items on which this excess amount of money may be spent. He points to the following language from W.Va.Code, 13–2–4:

"[The money received from the sale of refunding bonds] shall be set aside and held in trust and irrevocably dedicated

---

**15.** The use of an escrow fund to liquidate or defease the bonds originally issued is specifically authorized by W.Va.Code, 13–2–4. Even in the absence of statutory authorization, courts have held that the escrow technique is an acceptable method of retiring an original bond issue. *See, e.g., Albuquerque v. Gott, supra; Rodin v. State ex rel. City of Cheyenne, supra;* 64 Am.Jur.2d *Public Securities and Obligations*

§ 268 (1972). The court in *Rodin,* 417 P.2d at 189, stated: "[T]he irrevocable and positive commitment of moneys made presently available through the sale of refunding bonds, for either the immediate or future payment of both principal and accruing interest of outstanding securities, must be considered as an acceptable substitute for the actual discharge of debt."

solely to the payment of such bonds, except that amount in excess of the amounts required for the payment of the bonds so refunded may be applied to the payment of costs related to the issuance, carrying, insuring or servicing the refunding bonds, including costs of credit or market enhancement services, such as letters of credit, remarketing arrangements and similar services."

■ It appears that the intended purpose of the above-quoted provision is to enable the Board to spend any excess money on those expenses that directly result from the issuance of the refunding bonds. We do not believe that this forecloses the Board from utilizing any excess money for the real purpose of the project, which is for school building improvements.

■ Furthermore, we do not believe that W.Va.Code, 18–9–2c,[16] which authorizes the transfer of funds remaining from the liquidation of school bonds to the school current fund, precludes the use of excess money from an escrow fund established with the Bond Commission and derived from the sale of refunding bonds under W.Va.Code, 13–2–1 through –9, as long as the Board complies with W.Va.Code, 13–3–9(c).[17] This latter subsection enables a bond-issuing authority to withdraw excess funds held by the Bond Commission that are not needed to liquidate the original bond issue. These funds can be spent on school improvements when they are made a part of a refunding bond plan for school improvements. It is only when the last bond has been retired that W.Va.Code, 18–9–2c, comes into play. At that point, any

excess funds then remaining are turned back to the Board to the credit of its school current fund.

■ The voters in Hancock County, by approving of the original school bonds in 1980, authorized the Board to issue bonds in the aggregate principal amount of $13,885,000 for school construction and improvements. By spending this excess money on the school improvement project, the Board is simply carrying out the mandate of the voters. We, therefore, conclude that the Board's plan to spend some of the excess money from the sale of the refunding bonds on school improvements is not improper.

### IV.

### A.

### ISSUANCE OF $1,840,000 IN ORIGINAL BONDS

■ The next question is whether the Board can issue only $1,840,000 worth of the total $5,545,000 in unissued original bonds. We do not find any statute or other authority that would prohibit the Board from issuing less than the total amount of bonds authorized as part of an overall plan to complete the project. W.Va.Code, 13–1–4, requires voters to be informed in an election order of the total amount of the bonds authorized to be issued. In the Election Order, which was published as a legal advertisement, the Board stated that there might be less than the $13,885,000 in bonds issued.[18] Under W.Va.Code, 13–1–14, relat-

---

**16.** The relevant portion of W.Va.Code, 18–9–2c, is:

"The treasurers of the county boards of education are hereby authorized and directed to transfer to the credit of the school current fund of the boards of education of their respective counties, all remaining funds collected for the retirement of school bonds after such bonds shall have been retired, if the fact of such retirement has been certified by the state sinking fund commission."

**17.** W.Va.Code, 13–3–9(c), provides:

"*Withdrawal of additional funds.*—If an issuer has remitted to the commission funds not earmarked for the purpose of amortizing bonded indebtedness, all or a portion of such

funds may be withdrawn by the issuer upon sixty days written notice to the commission: Provided, that such withdrawal shall neither create a deficit in the issuer's account with the commission nor be in conflict with terms of the bond issue: Provided, however, that such funds were remitted or deposited with the commission on or after January one, one thousand nine hundred seventy-four."

**18.** The Election Order states:

"In the event the Board shall obtain additional money by grant or otherwise from the state or federal government, or from any agency of either, or from any other source, for use in the acquisition and construction of

ing to an original bond issue, it appears that the legislature intended that a bond-issuing authority could issue less than the total amount of bonds authorized at the election, if under all the circumstances the projects authorized by the voters can still be completed. This provision states that after the election approving the bond issue, "the governing body of the political division shall, by resolution, authorize the issuance of such bonds in an amount not exceeding the amount stated in the proposition."

The present case is factually distinguishable from *State ex rel County Court v. Partlow*, 130 W.Va. 777, 45 S.E.2d 506, 175 A.L.R. 813 (1947), on which the Secretary relies. There, we held that the bonds approved by the voters were void because the levy rates were insufficient to cover the principal and interest payments for the total amount of bonds approved. The county court agreed that the levy rates would liquidate a $600,000 bond issue and asked that it be authorized to issue this amount of bonds. We concluded that the issuance of a lesser amount of bonds would be improper because the voters had expressly authorized an airport facility costing $1,100,000 and not $600,000.

▪ In the course of our discussion, we observed that the voters had approved of going in debt for a $1,100,000 airport, not a $600,000 airport, which was the amount the levy rates could cover. Under the refunding bond plan in the present case, the voters are obtaining the school improvements they initially authorized without the necessity of issuing the entire amount of the original bonds. Consequently, we conclude the Board's plan to issue only a part of the remaining unissued original bonds is proper.

Again, we stress that this issue cannot be answered in isolation, but must be

viewed in light of the entire refunding bond plan, which is designed to complete the school improvement project without the necessity of issuing all of the original bonds. Furthermore, as we have emphasized earlier, the entire refunding bond plan still remains within the basic guidelines presented to and approved by the voters. It is in this context that we find that there is no requirement to issue all of the remaining $5,545,000 worth of unissued original bonds.

## B.

### ACCELERATED MATURITY SCHEDULE FOR $1,840,000 IN ORIGINAL BONDS

Under the Board's plan, the $1,840,000 in original bonds are to begin maturing in 1986 and will be paid off by 1989. This is a more rapid maturity schedule than contemplated in the original Election Order, where the entire $13,885,000 bond issue was scheduled to be liquidated over a twenty-year period. The Secretary argues that the maturity schedule set out in the Election Order must be strictly followed in order to carry out the mandate of the voters. We disagree.

▪ The Board was not required by W.Va.Code, 13–1–4, to include the proposed maturity schedule for the original bonds in the Election Order.[19] Obviously, the inclusion of the anticipated maturity schedule presented the voters with additional information concerning the proposed bond issue. However, we do not believe that the Board is strictly bound to follow the maturity schedule set out in the Election Order so long as its projected plan remains within the limits heretofore set.

The Board apparently has determined that by issuing these original bonds with a shorter maturity schedule, the marketabili-

---

the above-enumerated projects, such additional money may be used either in substitution for or in addition to the proceeds of the sale of the bonds proposed thereby, as may be determined by said Board and the granting body or agency."

**19.** W.Va.Code, 13–1–4, provides the information that must be contained in the Election Order

and under W.Va.Code, 13–1–8, this Election Order must be published in advance of the voter approval election. Under W.Va.Code, 13–1–4(f) and –4(g), the "[a]mount of the proposed bond issue" and the "[m]aximum term of [the] bonds and series" are only required to be published.

ty of the bonds will be increased. Several courts in other jurisdictions have upheld the validity of bonds where the maturity schedule included in the election order varied from the schedule ultimately adopted. *See Bd. of Supervisors v. Rechenmacher*, 105 Cal.App.2d 39, 232 P.2d 514 (1951); *State v. City of Miami*, 41 So.2d 888 (Fla. 1949); *City of Louisville v. Kesselring*, 257 S.W.2d 599 (Ky.1953).

In *Rechenmacher*, the bonds were incorrectly numbered in the election order and the bond-issuing authority chose to advance the maturities by two years. The California appellate court upheld the validity of the bonds, stating:

> "We think it cannot be said that by advancing the maturities of these five bonds by two years the boards committed an error which affected the substantial rights of taxpayers or electors. It has been the general rule that errors and irregularities in bond issue proceedings which did not increase or change the burden upon the taxpayers and could not mislead any elector to his prejudice would not invalidate the bonds." 105 Cal.App.2d at 43, 232 P.2d at 517–18.

In *City of Miami*, the maturity schedule was changed because economic conditions made it unfeasible for the bond-issuing authority to follow the schedule set out in the election order. The Supreme Court of Florida approved of the changed maturity schedule, explaining:

> "The freeholders approved the amount and purpose of the bonds, which were the same in both issues. Other requirements, such as denomination, maturities and series, are matters that may be imposed in the discretion of the issuing authority, so long as constitutional and statutory limitations are not transgressed. All the maturities here were within the time prescribed by the constitution. The fact that the bonds as issued were in five series instead of one, and that they were to mature from two to twelve years after date, as fixed by the Commission, is not material." 41 So.2d at 889.

In *City of Louisville*, 257 S.W.2d at 602, the Kentucky Court of Appeals found that the difference between the schedule included in the election order and the subsequent issuing ordinance was immaterial and concluded: "So long as there is a reasonable basis for the change, and the issuing ordinance does not increase the amount of the bonds, change their date, maximum rate of interest, or the number of years necessary for retirement, we do not think the variation materially affects the taxpayers."

■ In the present case, the new maturity schedule is well within the time period covered in the Election Order and the liquidation of these bonds and the refunding bonds remain within the debt service generated by the levy rate approved originally by the taxpayers. In view of these facts and the foregoing authorities, we conclude that the change in the maturity schedule proposed under the Board's plan does not violate the mandate of the voters.

## V.

## A.

## TAX LEVY RATES

The fifth issue presented involves whether the original tax levy rates must be reduced under the Board's proposed refunding bond plan. The statutory language relevant to this issue is contained in the following portion of W.Va.Code, 13–2–1:

> "The amount of taxes expected to be available in each year for purposes of this section shall be based upon the rates of levy stipulated in the order directing the election at which the issuance of the bonds being refunded was approved by the voters and upon the most recent assessed valuation of the affected property prior to such election. In the event only a portion of the bonds provided for such order are being refunded or have been issued, an appropriate reduction shall be made in the amount of taxes expected to be available based upon the actual debt service requirements of bonds which have been issued but are not being refunded and the estimated debt service

requirements of bonds which have not been issued."

The Secretary focuses only on the second sentence quoted above and argues that the estimated amount of taxes, i.e., the tax levy rates, for the refunding bonds must be reduced, since only a portion of the bonds originally approved by the voters is being refunded. He contends that the actual debt service requirements on bonds "which have been issued but are not being refunded" is zero because none of the bonds in this case fall into this category. He concludes that the tax levy rates for the refunding bonds must be appropriately reduced based on the estimated debt service requirements of the $5,545,000 in unissued original bonds.

We disagree with this interpretation of W.Va.Code, 13–2–1, because it isolates a small portion of one section of the Refunding Bond Act and is inconsistent with the entire tenor of the Act. Our historic rule of statutory construction in this regard is contained in Syllabus Point 1 of *State ex rel. Holbert v. Robinson*, 134 W.Va. 524, 59 S.E.2d 884 (1950):

> "A statute is enacted as a whole with a general purpose and intent, and each part should be considered in connection with every other part to produce a harmonious whole. Words and clauses should be given a meaning which harmonizes with the subject matter and the general purpose of the statute. The general intention is the key to the whole and the interpretation of the whole controls the interpretation of its parts."

*See also Woodring v. Whyte*, 161 W.Va. 262, 242 S.E.2d 238 (1978); *Spencer v. Yerace*, 155 W.Va. 54, 180 S.E.2d 868 (1971).

▮ As we have previously discussed, the Refunding Bond Act, W.Va.Code, 13–2–1 through –9, is designed to provide some flexibility as to the issuance of refunding bonds with regard to interest, maturity schedules and sales at discount, so long as the refunding bond plan does not exceed the basic constraints of the original bonds approved by the voters. The present re-

funding bond plan, which includes the issuance of $1,840,000 in original bonds, does come within the original constraints as we have previously pointed out.

▮ The language isolated by the Secretary is not applicable to the present case because, in our view, this provision in W.Va.Code, 13–2–1, is applicable to those situations where the refunding bond plan leaves a debt service which, when combined with any original bonds that will not be refunded, is below the levy originally authorized by the voters. In this event, all of the original tax levy is not needed to retire the bonds and this statutory language then requires a reduction in the tax levy. Again, we emphasize that this is not the situation presented by the Board's plan, as it is constructed to utilize all of the annual tax revenues during the maturity schedule of the bonds.

### B.

### LEVEL DEBT SERVICE

▮ The Board's plan is premised upon maintaining level debt service [20] rather than level principal payments, which was the basis for the original bonds. We do not find this difference to be objectionable as long as no increase in the tax levy rate is contemplated. It is conceded that under the Board's plan the first and last years of the proposed maturity schedule require lesser payments. W.Va.Code, 13–2–2, provides, in part:

> "The amount payable in each year on the refunding bonds, together with any unrefunded or unissued bonds of the prior issue, may be so fixed that, when *the amount of interest is added to the principal amount to be paid during the respective years, the total amount payable in each year shall be as nearly equal as practicable*; or such bonds may be made payable in annual installments as nearly equal in principal as may be

---

**20.** The Board states that the term "level debt service" means that the amount paid in principal and interest each year to retire a bond issue is basically the same.

practicable." (Emphasis added).[21]

W.Va.Code, 13–2–2, gives bond-issuing authorities the option of structuring their refunding bond plan to maintain either level debt service or level principal payments. Where level debt service is chosen, then the test is that the "total amount payable in each year shall be as nearly equal as practicable." W.Va.Code, 13–2–2.

In the present case, the debt service schedule is nearly level between the years 1986 to 1996, ranging approximately between $1.359 million and $1.4 million annually. The initial year 1985 will require approximately $174,000 in debt service and the last year 1997 will require approximately $27,500. We are not informed of the reason for the lower debt service in the first and last years, but it may be that since the bonds are serially redeemed annually, the first year carries only an interest factor and by the last year most of the bonds will have been redeemed.

■ We do not believe that the proposed debt service schedule violates the statutory "nearly equal as practicable" standard. W.Va.Code, 13–2–2. In *Baxa v. Partlow*, 132 W.Va. 859, 54 S.E.2d 825 (1949), we recognized that levy rates as authorized by the voters must be substantially followed. This rule is being followed by the Board in the present case. Furthermore, as we have previously stated, the present refunding bond plan is within the limits of the original voter mandate. In these circumstances, we do not believe that the reduction in the debt service for the first and last years of the plan are consequential enough to constitute a violation of the "nearly equal as practicable" language in W.Va.Code, 13–2–2.

## VI.

### 1979–80 ASSESSMENT OR 1980–81 ASSESSMENT

The Board claims that under W.Va.Code, 13–2–1, the estimate of assessed property values must be based "upon the most re-cent assessed valuation of the affected property prior to [the original bond approval] election," which would be the 1980–81 assessment. The Board points out that the original election was held on March 28, 1980. Under W.Va.Code, 11–3–6, the assessor was required to make his final certification of assessments of property by March 7, 1980, to the Board for the 1980–81 tax or fiscal year. Thus, the Board argues that the tax levy rates should be based upon the 1980–81 assessment and not the 1979–80 assessment.

The Secretary, however, contends that under W.Va.Code, 13–1–4(d), the Board was required in its Election Order to state the "[v]aluation of the taxable property as shown by the last assessment thereof for state and county purposes." The Election Order contained the 1979–80 assessment because it was adopted and published prior to the election and prior to the time that the 1980–81 assessment was received.

■ We believe both parties misconceive the function of the provision in W.Va. Code, 13–1–4(d), which requires the "[v]aluation of the taxable property as shown by the last assessment thereof for state and county purposes" to be placed in the Election Order. This provision is designed to give information to the voters as to the value of the property on which the levy rates for the liquidation of the bonds and their interest will be based. This same statute provides in subsection (1) that the election order will state "[t]hat the levying body is authorized to lay a sufficient levy annually to provide funds for the payment of the interest upon the bonds and the principal at maturity, and the approximate rate of levy necessary for this purpose."

■ Because the original bond issue is to be liquidated by funds obtained through a special property tax levy which the voters approved at the bond authorization election, it is necessary that the voters be given some approximation of the amount of the increased rate of taxation

---

**21.** The requirement that the debt service be "as nearly equal as practicable" was also in the 1925 version of W.Va.Code, 13–2–2.

arising from the special levy. In order to determine the levy rate, W.Va.Code, 13–1–4(d), establishes that the valuation of the property as shown by the last assessment be placed in the Election Order. This does not mean, however, that this assessment figure is locked into the life of the bond issue.[22]

It is apparent from W.Va.Code, 13–1–4, that the special bond levy is set annually based upon the current year's appraised values. This is reinforced by W.Va.Code, 13–1–20, which requires the bond-issuing authority "to pay annually the interest on such debt and the principal thereof falling due in each year, such tax to be levied and collected by the same officers, at the same time and in the same manner as the general taxes of the political division." [23]

The tax referred to in W.Va.Code, 13–1–20, is as stated in that section "on all property subject to taxation by the political division," which is the real and personal property taxes covered in W.Va.Code, 11–8–1 through –33. Under W.Va.Code, 11–8–9, the various local governmental units which have been given power to levy on real and personal property must meet between March 7 and March 28 to set their respective levies. *See generally City of Fairmont v. Pitrolo Pontiac-Cadillac Co.,* 172 W.Va. 505, 308 S.E.2d 527 (1983), *cert. denied,* 466 U.S. 958, 104 S.Ct. 2169, 80 L.Ed.2d 553 (1984). Under W.Va.Code, 11–3–6, the county assessor is required to make his annual certification to the various levying bodies showing the aggregate value of all property real and personal.

Clearly by including "the approximate rate of levy," pursuant to W.Va.Code, 13–1–4(*l*), in an election order prior to a bond election, voters are given notice that the rate of levy is estimated. The actual levy rate is determined annually based on the provisions of W.Va.Code, 13–1–20, which as previously noted, must be "sufficient in amount to pay annually the interest on such [bond] debt and the principal thereof falling due in each year."

It is equally apparent that the levy rates may vary somewhat in each year depending on the bond amortization schedule and each year's valuation of the real and personal property. If the bond issue is carried at a level debt service, *see* note 20, *supra,* in each year, the levy rate might still fluctuate from year to year because of the property values on which they operate. If property values increased each year on a level debt service bond issue, the levy rates would diminish because the higher property values would require a lower levy rate to meet the same annual level of bonded indebtedness. The converse is true if the annual property values diminish from the preceding year.

**22.** As we have previously pointed out in Part II(A), *supra,* W.Va.Code, 13–2–1, relating to increased interest rates on refunding bonds, contains the limitation that the debt service on the refunding bonds must be within the confines of the original tax levy authorized by the voters and requires this fact to be certified by the Chairman of the Bond Commission prior to issuing refunding bonds with a higher interest rate than the original bonds. This places a limitation on the refunding bond interest and debt service, but does not preclude the utilization of each current year's property valuation to set the amount of that year's levy rate. The limitation in effect ensures initially that the refunding bond plan will not increase the original tax burden approved by the voters.

**23.** The full text of W.Va.Code, 13–1–20, is:

"It shall be the duty of the governing body of any political division, at or before the time of issuing bonds under this article, to provide for the imposition and collection annually of a tax, in excess of all other taxes, on all property subject to taxation by the political division under the Constitution and laws of this State, sufficient in amount to pay annually the interest on such debt and the principal thereof falling due in each year, such tax to be levied and collected by the same officers, at the same time and in the same manner as the general taxes of the political division. Should any political division neglect or fail for any reason to impose or collect such tax for the payment of the principal or interest of any bonded indebtedness incurred under this article, any person in interest or the state tax commissioner may enforce the imposition and collection thereof in any court having jurisdiction of the subject matter, and any suit, action or proceeding brought for such purpose shall be heard and disposed of with reasonable dispatch."

Consequently, the answer to this issue is not whether the 1979–80 or the 1980–81 property values apply because each year's current property values are used to determine the levy rates.

## VII.

## WITHDRAWAL OF FUNDS FROM BOND COMMISSION

The Secretary questions the propriety of the Board's plan to withdraw the funds presently on deposit with the Bond Commission to be used to further school improvements rather than to help pay off the refunding bonds. In support of his position, the Secretary relies upon some dictum in *State ex rel. Hall v. County Court*, 100 W.Va. 11, 129 S.E. 712 (1925). In *Hall*, road bonds were issued to mature over forty years. The county retained the right to retire them after ten years from a sinking fund. After ten years had passed, the county court, rather than using all of the sinking fund money to pay off the outstanding bonds, chose to discharge some of these bonds. It then proposed to issue refunding bonds to retire the remainder of the outstanding debt. In the mandamus action brought by the tax commissioner before this Court, the Mercer County Court admitted it had erred in attempting to issue refunding bonds to retire the outstanding bonds without first applying the sinking fund money to the retirement of the bonds. We agreed that the sinking fund money should have been used to liquidate the original bonds before refunding bonds could be issued to retire the balance.

We do not believe *Hall* governs this case because in *Hall* the road project for which the bonds were originally issued had been completed. The retirement and refunding

of these bonds was the only thing that was left to accomplish. Therefore, the sinking fund money could only have been applied to retiring the outstanding bonds. Here, we are confronted with more than a simple plan to refund an original bond issue. The proposed plan in this case seeks as its primary goal to complete the school improvements authorized by the voters.

A key ingredient of the plan is to obtain the funds now deposited with the Bond Commission that accumulated from the tax levy imposed during the period when none of the original bonds had been sold. These funds are unencumbered in the sense that they are not earmarked for the purpose of amortizing the present bonded indebtedness. Thus, under W.Va.Code, 13–3–9(c),[24] the Board can obtain the funds from the Bond Commission.

The Secretary also contends that the following language from W.Va.Code, 13–2–4, prohibits the Board from spending the funds deposited with the Bond Commission on school improvements:

"It is the intention of this article to authorize political divisions to issue bonds for the purpose of refunding outstanding bonds without thereby contracting any additional indebtedness, and it shall be conditional upon the delivery of any refunding bonds that a like principal amount of the bonds to be refunded be cancelled and paid simultaneously with the issuance and delivery of such refunding bonds."

This language simply explains the refunding bond mechanism, which is that as the refunding bonds are delivered, the outstanding original bonds that are being refunded are cancelled or are considered to be cancelled. Under the other provisions of W.Va.Code, 13–2–4,[25] the original bonds

---

**24.** For the provisions of W.Va.Code, 13–3–9(c), see note 17, *supra*.

**25.** The relevant portion of W.Va.Code, 13–2–4, is:

"For all purposes of this section, bonds shall be considered to have been cancelled and paid in advance of their due date or date of redemption if there shall have been deposited with the West Virginia municipal bond commission either:

"(a) Moneys, sufficient to pay when and as due all amounts of principal and interest payable on such bonds; or

"(b) Direct obligations of the United States of America or the State of West Virginia, or obligations fully and irrevocably secured as to the payment of both principal and interest by such direct obligations, the payment on which when due will provide moneys, sufficient to pay when and as due all amounts of principal and interest payable on such bonds."

are deemed cancelled when the money to liquidate them derived from the sale of refunding bonds is placed in escrow with the Bond Commission. At this point, the escrowed funds satisfy the obligations created by the original bonds. The special levy monies are then used to retire the refunding bonds. We do not find that either the Refunding Bond Act or the Bond Act precludes the withdrawal of the funds as contemplated in this case.

■ We conclude that where a bond-issuing authority has been unable to market all of its original bond issue and is unable to complete the project financed by the bond issue, it may utilize for the project any unencumbered funds in its account with the Bond Commission in accordance with the provisions of W.Va.Code, 13–3–9(c), as a part of a refunding bond plan to complete the original project.

## VIII.

### REGISTRATION IN OUT–OF–STATE BANK

■ The remaining issue involves whether the refunding bonds, as well as the $1,840,000 in original bonds, can be registered with the Chemical Bank of New York without being registered with the State Treasurer.[26]

The Board contends that registration with the State Treasurer is not required. The Secretary contends that W.Va.Code, 13–1–17, requires registration with the State Treasurer. Both parties agree that by virtue of W.Va.Code, 13–2–3, the provisions of W.Va.Code, 13–1–17 through –20, dealing with original bonded indebtedness, are made applicable to refunding bonds.

W.Va.Code, 13–1–17, relates to registering coupon bonds as to principal and indicates that such "bonds may be registered as to the principal in the owner's name by the state treasurer on books which shall be kept at his office."[27]

The Board argues that under Section 103(j) of the Internal Revenue Code, in order for these bonds to obtain the desired tax-exempt status, they must be fully registered as to principal and interest. It appears that the bonds issued under the refunding bond plan will not be coupon bonds, but will have the interest paid semiannually to the registered holder.

Under W.Va.Code, 13–2–2, the bond-issuing authority has the right to have the bonds payable "at the office of the state treasurer and at such other place or places as the body issuing the same may designate." This same language is contained in W.Va.Code, 13–1–14, relating to the payment of the original bonds. Clearly, these provisions provide for multipayors of the bonds in the sense that the Board can designate places other than the State Treasurer's office where the bonds can be paid. We can see no reason why the payor cannot also act as co-registrar of the bonds. However, it is also clear that the funds for such payments originate from the Board's account with the Bond Commission.

■ Therefore, we believe that under W.Va.Code, 13–2–2, and W.Va.Code, 13–1–14, which authorize a bond-issuing authority to have bonds payable at the office of the State Treasurer and at such other places that the bond-issuing authority may designate, provide sufficient authority to permit the bonds to be registered at the

---

**26.** Generally, registration of a bond means that it is payable to a designated person rather than payable generally to the bearer. 64 Am.Jur.2d *Public Securities and Obligations* § 209 (1972).

**27.** The entire text of W.Va.Code, 13–1–17, provides:

"The bonds issued hereunder may be registered or coupon bonds. Coupon bonds may be registered as to the principal in the owner's name by the state treasurer on books which shall be kept at his office for the purpose and the registration shall also be noted on the bonds, after which no transfer shall be valid unless made by the state treasurer on the books of registration and similarly noted on the bonds. Bonds registered as to principal may be discharged from registration by being transferred to bearer, after which they shall be transferable by delivery; but may again, and from time to time, be registered as to the principal amount as before. The registration of coupon bonds as to the principal sum shall not affect the negotiability of the interest coupons, but title to the same shall pass by delivery."

place of payment. Duplicate lists of the registered bonds can be kept at both the State Treasurer's office and the Chemical Bank, with the payor where the bond is presented handling the payment and re-registration of the bond.

We, therefore, conclude for the reasons herein outlined that the refunding bond plan is lawful and, consequently, a writ of mandamus is issued, directing the respondent Secretary of the Hancock County Board of Education to execute the various documents involved in this project.

Writ awarded.