481 S.E.2d 730

STATE of West Virginia ex rel. SCHOOL BUILDING AUTHORITY OF WEST VIRGINIA, Relator

v.

Dr. Henry R. MAROCKIE, President, School Building Authority of West Virginia, Respondent.

No. 23675.

Supreme Court of Appeals of West Virginia.

Submitted Nov. 19, 1996.

Decided Dec. 13, 1996.

---

427

James K. Brown, Christopher L. Callas, Jackson & Kelly, Charleston, for Relator.

Silas B. Taylor, Managing Deputy Attorney General, Dawn E. Warfield, Deputy Attorney General, Charleston, for Respondent.

CLECKLEY, Justice:

In this original mandamus proceeding, the relator, the School Building Authority of West Virginia [hereinafter SBA], requests this Court to determine the SBA's authority to issue refunding bonds to discharge those SBA bonds issued prior to this Court's decision in *Winkler v. State School Building Authority*, 189 W.Va. 748, 434 S.E.2d 420 (1993). The respondent, Dr. Henry R. Marockie, State Superintendent of Schools and President of the SBA, *see* W.Va.Code, 18–9D–1 (1990), asserts that the proposed bond issuance, which would generate approximate-ly $5.66 million cash at the time the bonds are issued, violates certain provisions of the West Virginia Constitution and this Court's holding in *Winkler*. We issued a rule to show cause and now grant the writ of mandamus as moulded.[1]

## I.

### FACTUAL AND PROCEDURAL HISTORY

In 1988, the West Virginia Legislature created the School Building Authority of West Virginia (SBA) in order "to facilitate and provide state funds for the construction and maintenance of school facilities so as to meet the educational needs of the people of this state in an efficient and economical manner." W.Va.Code, 18–9D–15(a) (1989).[2] The Legislature also authorized the SBA to issue revenue bonds to finance its statutory purpose of improving the educational facilities in this State. *See* W. Va.Code, 18–9D–4 (1988). *See also* W. Va.Code, 18–9D–1 to –18 (collectively referred to as the "School Building Authority Act"). It seems apparent that the Legislature, in establishing the SBA's bond-issuing authority, intended to redeem any bonds issued by the SBA from the State's general revenue funds, without pledging the State's credit. W. Va.Code, 18–9D–6 (1988);[3] 18–9D–13 (1988); 18–9D–14 (1988). *See also* W. Va.Code, 11–15–30 (1994). In accordance with this statutory authority, the SBA issued Capital Improvement and Revenue and Refunding Bonds, Series 1993, in the amount of $338,145,000.[4]

---

1. The Honorable Arthur M. Recht resigned as Justice of the Supreme Court of Appeals of West Virginia effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the Supreme Court of Appeals of West Virginia commencing October 15, 1996, and continuing until further order of this Court.

2. The Legislature established the SBA, in part, in response to this Court's concern in *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979), that the State of West Virginia had failed to meet the guarantee of the West Virginia Constitution to provide "a thorough and efficient system of free schools." W. Va. Const. Art. XII, Sec. 1.

3. W.Va.Code, 18–9D–6 (1988), directs in this regard:

   "There is created in the state treasury a school building capital improvements fund to be expended by the authority [SBA] for the purposes of this article.
   "The school building authority shall have authority to pledge all or such part of the revenues paid into the school building capital improvements fund as may be needed to meet the requirements of any revenue bond issue or issues authorized by this article[.]"

4. The following disclaimer language appeared on the face of these bonds:

   " 'The Series 1993 Bonds are limited obligations of the Authority [SBA] payable solely

■ Disagreement concerning the constitutionality of the SBA's 1993 bond issuance with respect to Section 4 of Article X of the West Virginia Constitution resulted in our review of the SBA's bond-issuing authority in *Winkler.* We determined that "the [statutory] requirement of maintaining [a] sinking fund in order to service the bonds [issued by the SBA] and provide for their redemption indicates a financial commitment by the Legislature." 189 W.Va. at 763, 434 S.E.2d at 435. Accordingly, we held that the "[r]evenue bonds authorized under the School Building Authority Act, W. Va.Code, 18–9D–1, *et seq.,* constitute an indebtedness of the State in violation of Section 4 of Article X of the West Virginia Constitution." Syl. pt. 7, in part, *Winkler.* However, we limited this holding "[b]ased upon our general principles of retroactivity of judicial decisions," and recognized that the "revenue bonds issued by the State of West Virginia School Building Authority pursuant to W. Va.Code, 18–9D–1, *et seq.,* prior to the date of this opinion [July 22, 1993] are not invalid." [5] Syl. pt. 9, *Winkler.* Similarly, we concluded that "[b]ecause the previous issue of State of West Virginia School Building Authority bonds is not invalid under principles of retroactivity and because we also have determined that the refunding of bonds does not create new debt, the State of West Virginia School Building

Authority is authorized to issue refunding bonds from the Capital Improvement and Revenue and Refunding Bonds, Series 1993, to replace existing bonds at a lower interest rate." [6] Syl. pt. 10, *Winkler.*

Presumably in response to this Court's holding in *Winkler,* the West Virginia Legislature amended the School Building Authority Act expressly to permit the SBA to refund pre-*Winkler* bonds. The relevant portion of this revision provides:

"(a) *The school building authority may by resolution,* in accordance with the provisions of this article, *issue revenue bonds* of the authority from time to time, either to finance the cost of construction projects for public schools in this state, or *to refund, at the discretion of the authority, bonds issued to finance the cost of the construction projects for public schools in this state and outstanding under and pursuant to the provisions of this article as in effect prior to the twentieth day of July, one thousand nine hundred ninety-three.*[7] The principal of, interest and redemption premium, if any, on such bonds shall be payable solely from the special fund herein provided for such payment." W. Va.Code, 18–9D–4 (1994). (Emphasis and footnote added).[8]

from the Trust Estate pledged under the Indenture. The Authority may not at any time or in any manner pledge the credit or taxing power of the State, nor shall any of the obligations or debts created by the Authority under the Indenture be deemed to be obligations of the State.
" 'The Series 1993 Bonds are being issued on a parity with the lien of certain outstanding bonds of the Authority on amounts on deposit in the Revenue Fund. All Bonds issued under the Indenture are secured by a pledge of moneys appropriated by the West Virginia State Legislature and transferred to United National Bank, as the trustee, for deposit in the Revenue Fund established under the Indenture. AMOUNTS AVAILABLE TO BE TRANSFERRED TO THE TRUSTEE FOR DEPOSIT IN THE REVENUE FUND ARE SUBJECT TO ANNUAL APPROPRIATION BY THE STATE LEGISLATURE. THE STATE LEGISLATURE IS NOT LEGALLY OBLIGATED TO MAKE APPROPRIATIONS IN AMOUNTS SUFFICIENT TO PAY DEBT SERVICE ON THE BONDS.' " *Winkler v. State Sch. Bldg. Auth.,* 189 W.Va. 748, 752–53, 434 S.E.2d 420, 424–

25 (1993). (Emphasis in original; footnote omitted).

5. These bonds will hereinafter be referred to as "pre-*Winkler*" bonds.

6. This Court noted that approximately $154,000,-000 of the bonds at issue in *Winkler* were to "be used to refund the earlier bonds at a reduced interest rate[.]" 189 W.Va. at 766 n. 27, 434 S.E.2d at 438 n. 27. The parties to the instant case state that "[r]efunding bonds are bonds issued when market conditions are favorable (low interest rates) in order to refinance the debt service on bonds previously issued during less favorable market conditions (higher interest rates)." Appendix to the Response, Stipulation of Fact, para. 2, in part. (Footnote omitted).

7. *Winkler* was submitted to this Court for decision on July 20, 1993. We rendered a decision in *Winkler* on July 22, 1993.

8. In amending W. Va.Code, 18–9D–4 (1994), the Legislature also added subsection (b):
"(b) The school building authority may, in accordance with the provisions of the constitu-

The Legislature further provided that the "school building capital improvements fund" of the State treasury, originally created in 1988, W. Va.Code, 18–9D–6 (1988), would serve as the source of payment for both pre-*Winkler* bonds and those bonds subsequently issued to refund pre-*Winkler* bonds. W. Va. Code, 18–9D–6(a) (1993, 1994, & 1996).[9] Finally, the Legislature codified the procedure for handling any surplus funds generated by the refunding of pre-*Winkler* bonds:

> "*Any aggregate savings resulting from the issuance of refunding bonds pursuant to section four [§ 18–9D–4] of this article shall be retained by the school building authority.* Any savings shall be utilized solely for the construction and maintenance of schools and may not be used to fund administrative costs of the authority." W. Va.Code, 18–9D–4a (1996). (Emphasis added).

Despite this Court's acknowledgment in *Winkler* that the SBA could issue refunding bonds to replace pre-*Winkler* bonds, the SBA declined to do so until after the Legislature's enactment of W. Va.Code, 18–9D–4a, in March, 1996.[10] In response to the SBA's request for competitive bids from municipal bond underwriters, Smith Barney, Inc., developed a proposal for issuing Series 1996 refunding bonds. Smith Barney's "Proposal to Provide Underwriting Services," dated May 8, 1996, anticipated issuing $129,480,000 in new refunding bonds to discharge pre-*Winkler* bonds in the principal amount of $121,375,000. This proposal contemplated a savings to the State's general revenue fund of approximately $5,426,503.75, over the entire twenty-six year life of the bonds, as a result of reduced debt service.[11] It appears from the record that the SBA subsequently selected Smith Barney as the underwriter for its contemplated issuance of Series 1996 refunding bonds.

In July, 1996, Smith Barney provided the SBA with a compilation of alternative financing schemes which would result primarily in either (1) a savings to the State's general revenue fund as a result of reduced debt service or (2) a sum of "cash at closing"[12] which the SBA perceived to be immediately available to fund new school construction projects.[13] Although the record is somewhat

tion of West Virginia, issue general obligation bonds from time to time as authorized by referendum pursuant to resolution duly adopted by the Legislature, to finance the cost of construction projects for public schools in this state."

9. In 1996, the Legislature further amended this section to provide that "[t]he school building capital improvements fund shall be an interest bearing account with interest credited to and deposited in the school building capital improvements fund[.]" W. Va.Code, 18–9D–6(a) (1996).

10. The facts presented by the parties do not indicate why the SBA did not earlier refund the pre-*Winkler* bonds.

11. "Debt service" generally refers to the funds necessary to repay the principal, interest, and other associated costs of bonds over the entire life of the bonds. The issuance of refunding bonds often reduces the amount of debt service payments because the refunding bonds are issued at a lower interest rate than the bonds to be refunded.

12. The parties use the term "cash at closing" to refer to the advance capitalization of debt service savings. In other words, rather than realizing the benefit of issuing lower interest refunding bonds over the life of the refunding bonds as reduced debt service, "cash at closing" contemplates receiving the benefit of the lower interest

rate in a lump sum payment of cash at the time the new bonds are issued. *See* Resp.App., Stipulation of Fact, para. 5.

13. The "Savings Analysis" compiled by Smith Barney on July 24, 1996, lists four alternative financing schemes, which are different from the schemes originally proposed by Smith Barney on May 8, 1996. In sum, the proposed issuances are:

(1) "Level Savings"
This scenario contemplates issuing $139,635,000 in new refunding bonds to discharge pre-*Winkler* bonds in the principal amount of $128,860,000. Over the life of the bonds (twenty-six years), the State's general revenue fund would realize debt service savings in the amount of $9,157,211.25. A minimal amount of cash at closing, $4,562.45, also results from this scenario.

(2) "Cash at Closing" or "Matched Debt Service"
This proposal requires issuing $144,350,000 in new refunding bonds to discharge pre-*Winkler* bonds in the principal amount of $128,860,000. This scheme does not provide any significant debt service savings to the State's general revenue fund ($58,647.50), but it would generate $4,688,972.15 cash at closing. The SBA anticipates using this cash at closing to fund new school construction projects.

unclear, it seems that after reviewing these scenarios the SBA decided to issue "Capital Improvement Revenue Refunding Bonds, Series 1996" to refund certain pre-*Winkler* bonds [14] and, on August 27, 1996, adopted a resolution reciting this purpose. In this resolution, the SBA directed Dr. Henry R. Marockie, President of the SBA,[15] to execute all documents necessary to effectuate the Fifth Supplemental Indenture (the issuance of Series 1996 refunding bonds).[16] By letter of the same date, the respondent, Dr. Marockie, refused to execute the Fifth Supplemental Indenture and other necessary documents, until this Court has reviewed this matter, because of his concern that the proposed bond issue violates various provisions of the West Virginia Constitution or abrogates this Court's prior holding in *Winkler, supra.*[17]

(3) "Deferred Savings"

This plan considers issuing $139,815,000 in new refunding bonds to discharge pre-*Winkler* bonds in the principal amount of $128,860,000. Over the life of the bonds, which would be reduced by five years, (twenty-one years as altered by this plan) the State's general revenue fund would realize debt service savings in the amount of $17,556,387.50. This plan would also generate cash at closing in the amount of $2,267.51.

(4) "Adjusted Deferred Savings" or "Deferred and Matched"

This scheme envisions issuing $139,495,000 in new refunding bonds to discharge pre-*Winkler* bonds in the principal amount of $128,860,000. In addition, this scenario proposes issuing an additional $4,739,178 in new Matching Capital Appreciation Bonds (apparently these capital appreciation bonds would be financed by the otherwise realized debt service savings resulting from the refunding bonds). While this proposal does not provide any significant debt service savings to the State's general revenue fund ($58,930.62), it would generate $4,600,290.75 cash at closing. The SBA anticipates using this cash at closing to fund new school construction projects.

14. In *Winkler*, this Court authorized the SBA to refund Series 1993 pre-*Winkler* bonds. *See* Syl. pt. 10, *Winkler, supra.* However, in the instant case, Smith Barney suggested, and the SBA apparently has resolved, to refund bonds from Series 1990A, 1990B, 1991A, and 1992A, because changing interest rates and market conditions have negatively impacted the profitability of refunding the Series 1993 bonds. *See* Appendix to the Petition, Revised Refunding Analysis, p. 1.

15. Dr. Henry R. Marockie, by virtue of his position as State Superintendent of Schools, is both an ex officio member and the President of the SBA. *See* W. Va.Code, 18–9D–1 (1990).

16. In pertinent part, the *BOND AUTHORIZING RESOLUTION OF THE SCHOOL BUILDING AUTHORITY OF WEST VIRGINIA* provides:

"*Section 2. Approval of Fifth Supplemental Indenture and Other Bond Documents.* The Fifth Supplemental Indenture and Other Bond Documents shall be and the same are hereby approved in all respects. *The President of the Authority [SBA] shall execute and deliver the Fifth Supplemental Indenture and Other Bond Documents with such changes, insertions and omissions as may be approved by the President,* and the Secretary is hereby authorized and directed to affix the seal of the Authority to the Fifth Supplemental Indenture and Other Bond Documents and attest the same. The execution of the Fifth Supplemental Indenture and Other Bond Documents by said President shall be conclusive evidence of any approval required by this Section." (Emphasis added). The resolution further directs the SBA's Finance Committee to select the refunding scheme most beneficial to the SBA:

"*Section 4. Refunding of Portion of Bonds; Changes and Other Actions Related Thereto.* The Authority hereby authorizes the Finance Committee to approve the issuance of Series 1996 Bonds for the purpose of refunding a portion of the [pre-*Winkler*] Bonds if the Finance Committee determines that sufficient debt service savings can be achieved with respect to the Bonds proposed to be refunded[.]"

17. The letter from Dr. Henry R. Marockie, President of the Board, School Building Authority of West Virginia, to Clacy Williams, Executive Director, School Building Authority of West Virginia, dated August 27, 1996, states, in part:

"I must and do respectfully decline to execute the Fifth Supplemental Indenture or any other associated bond documents necessary to effect the issuance of these refunding bonds until the constitutionality of the proposed refunding bond issue has been finally adjudicated.

"I am advised that issues persist as to whether the proposed refunding bond issue violates certain provisions of the Constitution of the State of West Virginia and the holding of the Supreme Court of Appeals in *Winkler,* including:

"a. Whether the *Winkler* decision as it addressed the refunding of pre-*Winkler* bonds may be interpreted and applied to permit the refunding of such pre-*Winkler* bonds which were not included for refunding in the proposed refunding issue before the Court in *Winkler?*

"b. Whether the *Winkler* decision, by freezing the 'school building capital improvements fund' at the level of discretion-

The day following the SBA's resolution and Dr. Marockie's letter, Smith Barney tendered to the SBA a "Revised Refunding Analysis." The revised proposal contemplates issuing $144,130,000 in new refunding bonds to discharge pre-*Winkler* bonds in the principal amount of $127,200,000.[18] After deducting the costs of the bond issuance, bond insurance, and underwriter's fees, a bond issuance in accordance with the revised analysis would result in approximately $5,665,197.67 cash at closing. The SBA states that this cash at closing would be immediately available for new school construction projects pursuant to W. Va.Code, 18–9D–4a.[19] This scheme also contemplates debt service savings to the State's general revenue fund in the amount of $62,931.25 which would be realized over the twenty-six year life of the new refunding bonds. It is this revised proposal that the SBA requests this Court to approve in this original jurisdiction proceeding. The SBA further requests this Court to issue a writ of mandamus compelling Dr. Marockie to execute the Fifth Supplemental Indenture and other documents necessary for the SBA to proceed with the issuance of Series 1996 refunding bonds.

## II.

### DISCUSSION

Once again, we are presented with a test case regarding the issuance of bonds. The relator SBA seeks judicial clearance so that it may proceed with its proposed issuance of Series 1996 bonds to refund certain pre-*Winkler* bonds. In response to the concerns raised by respondent Dr. Marockie, the SBA requests this Court to determine (1) whether the SBA has the authority to refund pre-*Winkler* bonds that were not designated for refunding by this Court in the *Winkler* decision; (2) whether this Court in *Winkler*, by limiting the "school building capital improvements fund" to the level of discretionary legislative appropriations from the State's general revenue fund necessary to repay outstanding pre-*Winkler* bonds, converted the "school building capital improvements fund" into a "special" or "separate" fund; and (3) if, in fact, this Court converted the "school building capital improvements fund" into a "special" or "separate" fund, whether the SBA may issue refunding bonds in an amount greater than the principal amount of the pre-*Winkler* bonds to be refunded in order to (a) utilize "advance refunding" or (b) receive "cash at closing" (the net present value of the anticipated debt service savings that would otherwise be realized over the life of the bonds) to immediately be used for new school construction projects. After a brief discussion of the standard for issuing a writ of mandamus, we will address the merit of the parties' contentions.

ary legislative appropriations from the State's general revenue fund needed to satisfy the payment obligations of the pre-*Winkler* bonds then outstanding, converted the 'school building capital improvements fund' into a 'special' or 'separate' fund as delineated in the *Winkler* case and its progeny?

"c. Whether within the limits of the school building capital improvements fund, as a 'special' or 'separate' fund, the SBA may exercise its discretion to issue refunding bonds in an aggregate principal amount in excess of the aggregate principal amount of pre-*Winkler* bonds which are refunded to enable it:

"(1) To utilize 'advance refunding'; and

"(2) To receive the net present value of interest savings at the time the refunding bonds are issued for immediate use in furtherance of its school construction and maintenance purposes?

"Consequently, I believe it would be improvident for the School Building Authority to issue additional bonds until these issues are finally resolved by a court of competent jurisdiction."

**18.** Of this $144.13 million, approximately $136,996,790.69 of the refunding bond proceeds will be invested in United States Treasury obligations and placed in an irrevocable trust to eventually pay the principal, interest, and redemption premium for those pre-*Winkler* bonds designated for refunding but which are not yet due and payable or which are not subject to early redemption.

**19.** In his response brief, Dr. Marockie contends that the anticipated $5.66 million cash at closing will require the State's general revenue fund to expend approximately $10.88 million for debt service payments over the twenty-six year life of these bonds. By contrast, Dr. Marockie asserts that if the SBA issued refunding bonds in the amount of $138,410,000 (the amount necessary to discharge pre-*Winkler* bonds in the principal amount of $127,200,000 without generating cash at closing), the general revenue fund would realize debt service savings of $10,946,512.75.

### A. Standard for Issuing Writ of Mandamus

██ The remedy of mandamus is a drastic one, to be invoked only in extraordinary situations where the relator can show a clear and indisputable right to relief sought. As we have noted in our prior decisions, mandamus is a remedy that is available only in limited and truly exceptional circumstances. *See, e.g., State ex rel. Billings v. City of Point Pleasant,* 194 W.Va. 301, 303, 460 S.E.2d 436, 438 (1995) (stating "[s]ince mandamus is an 'extraordinary' remedy, it should be invoked sparingly" (footnote omitted)); *State ex rel. United States Fidelity & Guar. Co. v. Canady,* 194 W.Va. 431, 436, 460 S.E.2d 677, 682 (1995) (providing "[m]andamus, prohibition and injunction against judges are drastic and extraordinary remedies.... As extraordinary remedies, they are reserved for really extraordinary causes" (citations omitted)).

██ When dealing with a proposed bond issuance, our case law has not been so demanding. Nevertheless, our analysis involves two complementary considerations. First, the issue presented must be one for which there has been a tradition of judicial accessibility. *See State ex rel. Marockie v. Wagoner,* 190 W.Va. 467, 469 n. 1, 438 S.E.2d 810, 812 n. 1 (1993) (stating "[t]his type of proceeding [mandamus] has been the traditional format for this Court to pass on the constitutionality of state bonds in advance of their issuance" (citations omitted)).[20] The second consideration is whether immediate judicial access would play a significant positive role in the resolution of the particular constitutional problem in question. *See State ex rel. Lawrence v. Polan,* 192 W.Va. 629, 635, 453 S.E.2d 612, 618 (1994) (stating "we have commonly recognized that a writ of mandamus is a proper method of testing the legality of a bond issue before the bonds are actually issued"). Although we traditionally have encouraged governmental entities to test the legitimacy of a proposed bond issuance by way of mandamus prior to issuing

the bonds in question, the continuation of our prior practice in this area will be adhered to only when this Court's prior decisions are not believed adequate to provide proper guidance for meaningful legal evaluation. When a proposed issue adheres to legal principles we have enunciated in these bond cases, there is no need to seek prior judicial approval, and we will not entertain the original action. In the case *sub judice,* the parties to this original action legitimately seek to clear up a gap left open by our prior opinions. Thus, we find that mandamus is an appropriate method by which the SBA may challenge its authority to issue the Series 1996 refunding bonds proposed in this case.

### B. Authority of the SBA to refund pre-Winkler bonds that were not designated for refunding by this Court in Winkler

Before proceeding to the merits of this case, one consideration weighs heavily in our analysis, and we state it at the outset. Our prior decisions have stretched and expanded constitutional principles regarding debt limitations as far as we can legitimately permit. In future cases, counsel would be well advised to seek constitutional revision and not judicial expansion of our bond cases. To some extent, this case underscores our concern.

The SBA argues this Court's holding in *Winkler,* authorizing the SBA to refund pre-*Winkler* bonds, applies both to those bonds designated for refunding in *Winkler* (Series 1993 bonds) and to those other pre-*Winkler* bonds that were not specified for refunding. In this regard, the SBA contends that *Winkler* establishes two relevant propositions. First, a portion of the bonds at issue in *Winkler* were to be used to refund earlier bonds, and second, refunding bonds are generally perceived as not creating new indebtedness. *See Winkler,* 189 W.Va. at 766 n. 27, 765–66, 434 S.E.2d at 438 n. 27, 437–38. *See also Board of Educ. of County of Hancock v.*

---

**20.** In fact, in *Winkler,* we chastised the SBA for not testing the propriety of the Series 1993 bonds before they were issued:

"We are amazed that no attempt was made before the original issue of the SBA bonds to obtain an opinion as to their validity from the

Attorney General. Moreover, in view of the amount involved and the purpose of the bonds, prudence would have dictated that a court determination should have been sought as to their legality." 189 W.Va. at 766, 434 S.E.2d at 438.

*Slack,* 174 W.Va. 437, 445, 327 S.E.2d 416, 425 (1985) (finding "[t]here is no question that the majority of jurisdictions still hold that refunding bonds do not create a new indebtedness"). Indeed, we did hold that the issuance of Series 1993 bonds to refund earlier bonds would not violate West Virginia Constitution Article X, Section 4. 189 W.Va. at 765–66, 434 S.E.2d at 437–38.

Adopting our reasoning in *Winkler,* the SBA urges that we now should permit the issuance of the contemplated Series 1996 bonds. Specifically, the SBA seeks judicial approval of the issuance of the contemplated Series 1996 bonds, which are intended to refund certain pre-*Winkler* bonds, on the legal premise that we allegedly did not limit, in *Winkler,* the authority of the SBA to refund pre-*Winkler* bonds to only those bonds designated for refunding. In short, the SBA asserts we did not restrict the scope and breadth of our *Winkler* analysis, and the reach of *Winkler* therefore covers any other pre-*Winkler* bonds. As with the Series 1993 refunding bonds approved in *Winkler,* the proposed Series 1996 refunding bonds would be issued at a lower interest rate than the pre-*Winkler* bonds they are intended to refund. However, the SBA submits that it is not feasible to refund the same bonds contemplated to be refunded in *Winkler* because different interest rates, changing market conditions, and the bond terms themselves affect the overall profitability of bond refunding. Thus, the SBA requests this Court to approve its proposal to refund pre-*Winkler* bonds different than those contemplated for refunding in the *Winkler* decision. Dr. Marockie does not respond to this argument.

■ We find the argument of the SBA persuasive. In spite of our specific direction in *Winkler* that the SBA would be permitted to refund Series 1993 bonds, we do not believe it is judicially sound or feasible to limit our prior holding to refunding by the SBA of only the 1993 bonds. The SBA is correct in its assertion that refunding bonds generally do not constitute a new indebtedness because they provide a method of refinancing an earlier bond issue at a lower interest rate. *See, e.g., County Comm'n of Boone County v. Hill,* 194 W.Va. 481, 487 n. 6, 460 S.E.2d 727,

733 n. 6 (1995); *Winkler,* 189 W.Va. at 765–66, 434 S.E.2d at 437–38; *Slack,* 174 W.Va. at 444–45, 327 S.E.2d at 424–25. Here, we are faced with a situation in which the SBA does not propose the incurrence of new debt, but rather wishes merely to refund a portion of its prior debt in order to reap the benefits of lower interest rates.

■ The facts before the Court suggest that a refunding of Series 1993 bonds, as originally contemplated in *Winkler,* would not be as economically beneficial to the SBA as a refunding of other pre-*Winkler* bonds, as proposed in the instant case. In our present society, ever-changing market conditions frequently result in a financial atmosphere that differs drastically from day to day. Because bonds and their interest rates are affected by these economic circumstances and because such deviations are beyond the control of the SBA, we necessarily must permit the SBA to refund pre-*Winkler* bonds different from those specified in the *Winkler* decision. Otherwise, the SBA would be unable to realize the value of redeeming earlier bonds at lower interest rates, thereby obtaining substantial debt service savings. A refusal on our part to permit the SBA to select the bonds most appropriate for refunding would effectively abrogate the capacity of the SBA to refund any of its pre-*Winkler* bonds. Accordingly, we find that the SBA may refund pre-*Winkler* bonds that were not specifically designated for refunding in our prior decision.

C. *Effect of Winkler decision upon "school building capital improvements fund" vis-a-vis creation of "special" or "separate" fund*

This decision brings us to the SBA's second contention. The SBA next asserts that this Court's decision in *Winkler,* which limited the "school building capital improvements fund" to those discretionary appropriations from the State's general revenue fund necessary to repay outstanding pre-*Winkler* bonds, effectively converted the "school building capital improvements fund" into a "special" or "separate" fund. In *Winkler,* we ruled that new revenue bonds issued by the SBA pursuant to the School Building Author-

ity Act, W. Va.Code, 18–9D–1 to –18, and payable from the school building capital improvements fund, violate the prohibition on State-incurred debt in West Virginia Constitution Article X, Section 4.[21] *Winkler*, 189 W.Va. at 764, 434 S.E.2d at 436. However, we declined to make this decision retroactive and ruled further that the SBA could issue refunding bonds to discharge the pre-existing bonds at issue in *Winkler*. Thus, the SBA urges that we effectively continued the school building capital improvements fund for the specific purpose of discharging these pre-existing obligations and maintaining the debt service for the new refunding bonds.

In support of its position, the SBA relies upon our statement in Syllabus Point 6 of *Winkler*:

> "Section 4 of Article X of the West Virginia Constitution is not designed to prohibit the State or the state's agencies from issuing revenue bonds that are to be liquidated from contracts requiring rental payments from another state agency or from contracts for necessary services such as utilities; *nor does this constitutional provision preclude the issuance of revenue bonds which are to be redeemed from a special fund.*" (Emphasis added).

The SBA contends that bonds are constitutionally permissible when they will be redeemed from a special fund. In *Winkler*, we stated that "the special fund doctrine is based on the fact that a *specific source of revenue* is required to be identified and committed to the repayment of the bonds beyond mere annual appropriations from the general revenue fund." 189 W.Va. at 758, 434 S.E.2d at 430. (Emphasis in original). Because the pre-*Winkler* bonds, and any bonds issued to refund these bonds, are to be redeemed from the school building capital improvements fund, the SBA contends that this Court, in effect, converted this fund into a "separate" or "special" fund for the purpose of redeeming SBA bonds. Moreover, the SBA asserts that the school building capital improvements fund addresses this Court's acknowledgment that the identification and dedication of a special fund necessarily limits the maximum value of bonds that may be issued. In this manner, the SBA's bonded indebtedness, as a result of the pre-*Winkler* bonds and new refunding bonds, is limited by the existence of a specific fund, the school building capital improvements fund, for redeeming these bonds.

By contrast, Dr. Marockie contends that no "special" or "separate" fund exists for the repayment of pre-*Winkler* bonds or for the maintenance of debt service for refunding bonds issued to redeem pre-*Winkler* bonds. He argues that W. Va.Code, 18–9D–6 (1996), forecloses any construction of the school building capital improvements fund as a "special" fund since this provision does not create a fund separate and apart from the general revenue fund or provide any source of income for the fund other than from appropriations from the State's general revenue.[22] In addition, the respondent asserts that, in *Winkler*, this Court authorized continuance of the school building capital improvements fund for the sole purpose of repaying the pre-*Winkler* bonds. Therefore, Dr. Marockie argues this limited role of the fund cannot be construed as also permitting it to finance any new refunding bonds or any new construction projects made possible by the issuance of excess "refunding" bonds.[23]

---

**21.** West Virginia Constitution Article X, Section 4, provides:

> "No debt shall be contracted by this State, except to meet casual deficits in the revenue, to redeem a previous liability of the State, to suppress insurrection, repel invasion or defend the State in time of war; but the payment of any liability other than that for the ordinary expenses of the State, shall be equally distributed over a period of at least twenty years."

**22.** W.Va.Code, 18–9D–6(a) (1996), provides, in part:

> "(a) There is continued in the state treasury a school building capital improvements fund to

be expended by the authority [SBA] as provided in this article[.]"

This statute does not indicate whether, in fact, the school building capital improvements fund is a part of, or distinct from, the general revenue fund.

**23.** The respondent proposes that the term "refunding bonds" does not encompass those bonds issued at the same time as bonds intended to redeem pre-existing bonds but which provide revenue for new construction projects (rather than redeeming older bonds).

Moreover, Dr. Marockie asserts that this Court recognized the decision to appropriate moneys to the school building capital improvements fund would be entirely within the Legislature's discretion because this Court cannot dictate how the Legislature should satisfy its pre-existing debts. *See Gribben v. Kirk,* 197 W.Va. 20, 475 S.E.2d 20 (1996). Therefore, while the school building capital improvements fund may exist for the repayment of pre-*Winkler* bonds, whether the fund will contain any moneys available to discharge these obligations is entirely within the Legislature's discretion. In this regard, the respondent notes this Court's decision in *State ex rel. Marockie v. Wagoner,* 190 W.Va. 467, 438 S.E.2d 810 (1993). In *Marockie,* we invalidated the Legislature's creation of a "special fund" for debt service of SBA bonds because the source of the dedicated funds, sales tax revenues, traditionally had been deposited into the State's general revenue fund. Thus, the respondent states that even if the Legislature designates specific moneys as income for the school building capital improvements fund, both the *dedication* of moneys to the "special" fund and the *source* of the dedicated moneys are relevant in determining whether a "special" fund actually exists.

■ To determine whether, in fact, the school building capital improvements fund is a "special" or "separate" fund, we must review the "separate fund doctrine." In *Winkler,* we noted that:

> "the special fund doctrine is based on the fact that a *specific source of revenue* is required to be identified and committed to the repayment of the bonds beyond mere annual appropriations from the general revenue fund. [B]y identifying and dedicating this specific source of funds, the process automatically limits the total value of bonds that can be used. The Legislature will have to quantify initially the amount it is willing to commit in order to avail itself of the special fund doctrine." 189 W.Va. at 758, 434 S.E.2d at 430. (Emphasis in original).

24. For a detailed explanation as to why the *Winkler* holding does not permit the issuance of

Based upon the facts presented by the parties, we find that any attempt to construe the school building capital improvements fund as a "special" fund must fail. As the respondent notes, W. Va.Code, 18–9D–6, which creates this fund, does not specify any source of revenue to maintain this fund. Therefore, one may infer that the school building capital · improvements fund is to be funded by appropriations from the general revenue fund. In fact, our holding in *Winkler,* which limits the continuance of the school building capital improvements fund to the level of discretionary legislative appropriations needed to redeem the pre-*Winkler* bonds, suggests that moneys from the general revenue would be used to finance this fund. Since there is no source of funding separate and apart from "appropriations from the general revenue fund," characterization of the school building capital improvements fund as a "special" or "separate" fund is precluded. Accordingly, we hold that the school building capital improvements fund is not a "special" fund.

■ Upon resolving this issue, we must note our disagreement with a portion of the arguments tendered by Dr. Marockie. The respondent apparently believes that our holding in *Winkler* prohibited the school building capital improvements fund from financing any new refunding bonds issued to redeem pre-*Winkler* bonds or from funding new school construction projects. Although we agree that this fund cannot finance new construction projects,[24] we expressly find that it is available to fund refunding bonds such as those currently proposed by the SBA. Were this not the case, our decision in *Winkler,* permitting the SBA to issue refunding bonds, would have no practical effect whatsoever since the authority to issue refunding bonds is moot without a source from which to repay such bonds. Thus, we find that this fund is available to repay refunding bonds issued by the SBA to redeem pre-*Winkler* obligations.

D. *Authority of SBA to issue additional refunding bonds in order to (1) utilize "advance refunding" or (2) receive "cash at closing"*

Finally, the SBA contends that if, in fact, this Court converted the "school building

bonds to finance new school construction projects *see* Section II.D.2., *infra.*

capital improvements fund" into a "special" or "separate" fund, the SBA may issue refunding bonds in a principal amount greater than the principal amount of the pre-*Winkler* bonds to be refunded in order to (1) utilize "advance refunding" or (2) receive "cash at closing" (the net present value of the anticipated debt service savings that would otherwise be realized over the life of the bonds) to immediately be used for new school construction projects. The SBA asserts further that the only limitation upon its authority to issue refunding bonds is that the post-refunding total debt service (for the refunding bonds and any remaining pre-*Winkler* bonds) cannot be greater than the total pre-refunding debt service (for the pre-*Winkler* bonds). In support of its position, the SBA cites *Slack* in which we determined that a refunding scheme is generally valid if the total obligation (principal and interest for both the refunding bonds and the pre-existing bonds that have not been refunded) is less than, or equal to, the total obligation originally authorized by the voters. 174 W.Va. at 445–46, 327 S.E.2d at 425–26.

Although the SBA concedes that the instant case does not involve voter-approved debt, it asserts that this Court, in *Winkler*, established the total debt level that the SBA is permitted to incur: the total amount needed to discharge the remaining pre-*Winkler* bonds. Thus, because the proposed Series 1996 refunding bonds do not exceed the maximum allowable debt, the SBA contends that it should be permitted to structure its bond issuance to include advance refunding and cash at closing.

Dr. Marockie disputes the SBA's logic in this regard and states that the SBA cannot issue bonds in excess of those necessary "to redeem a previous liability of the State." W. Va. Const. Art. X, Sec. 4. The respondent disputes the applicability of *Slack* and other decisions cited by this Court in *Winkler* because such decisions did not address Section 4 of Article X of the West Virginia Constitution. By contrast, this Court, in *Winkler*, specifically considered Section 4 in authorizing the SBA to issue refunding bonds to redeem certain pre-*Winkler* bonds. Since Section 4 expressly permits the State to in-

cur debt for the limited purpose of "redeem[ing] a previous liability of the State," Dr. Marockie contends that the SBA's issuance of refunding bonds to redeem pre-*Winkler* bonds constitutes a new State debt permitted by Section 4. In this regard, the respondent asserts that any prior authority the SBA had to issue the original pre-*Winkler* bonds is irrelevant because Section 4 governs the SBA's proposed issuance of refunding bonds. Moreover, Section 4 limits the purpose of the SBA's refunding bonds to the satisfaction of pre-existing bonds. This section does not condone a purpose other than the redemption of a previous debt. Accordingly, Dr. Marockie contends that the SBA may not issue refunding bonds in excess of the amount needed to discharge the pre-*Winkler* obligations in order to obtain financing for new school construction.

### 1. Advance refunding

The SBA states that many of the pre-*Winkler* bonds which it proposes to refund through the Series 1996 refunding bonds are not yet due and payable and have not yet reached their first call dates. In order to provide for the redemption of these bonds, the SBA, in accordance with the recommendations of Smith Barney, proposes the establishment of an escrow account into which a portion of the refunding bond proceeds would be deposited. These proceeds would then be invested in United States Treasury obligations, and the principal and interest of these obligations would be available to redeem the appropriate pre-*Winkler* bonds as they come due.

In conjunction with this advance refunding scheme, the SBA would be required to issue refunding bonds in a greater principal amount than the principal amount of the pre-*Winkler* bonds they are intended to refund because federal regulations governing such programs require the escrow account to yield no more than the average interest rate of the refunded bonds. *See* 26 U.S.C. § 148 (1994). The condition of a low-yield escrow account requires a larger amount of escrow principal in order to satisfy the higher interest rate enjoyed by the bonds to be refunded. Through this process of advance refunding,

the SBA would still issue refunding bonds with a lower interest rate than the pre-*Winkler* bonds to be refunded. *Citing Slack,* 174 W.Va. at 446 n. 9, 327 S.E.2d at 425 n. 9 ("We note that W. Va.Code, 13–2–1 [1984], appears to permit the issuance of a greater principal amount of refunding bonds than the bonds to be refunded if 'the amount of debt service payable on such refunding bonds in each year is equal to or less than the amount of taxes expected to be available therefor[.]' We express no view on the validity of this provision").

In further support of its authority to utilize advance refunding, the SBA notes that this Court has earlier approved the use of escrow accounts in refunding schemes without specifically using the term "advance refunding":

> "The use of an escrow fund to liquidate or defease the bonds originally issued is specifically authorized by W. Va.Code, 13–2–4 [1984]. Even in the absence of statutory authorization, courts have held that the escrow technique is an acceptable method of retiring an original bond issue.... The court in *Rodin [v. State ex rel. City of Cheyenne]*, 417 P.2d [180,] 189 [Wyo. 1966], stated: '[T]he irrevocable and positive commitment of moneys made presently available through the sale of refunding bonds, for either the immediate or future payment of both principal and accruing interest of outstanding securities, must be considered as an acceptable substitute for the actual discharge of debt[.]' " *Slack,* 174 W.Va. at 449 n. 15, 327 S.E.2d at 429 n. 15.

Similarly, the SBA contends that W. Va. Code, 18–9D–9 (1993),[25] expressly authorizes advance refunding by permitting the SBA to deposit refunding bond proceeds into a trust in order to pay the principal, interest, and redemption premium of bonds that are not presently due.

While the respondent does not reply directly to this argument, he does oppose any attempt by the SBA to issue refunding bonds in an amount greater than that necessary to redeem the pre-*Winkler* obligations. *See* Section II.D.2., *infra.*

▇ The advance refunding scheme proposed by the SBA has never been formally approved by this Court. In *Slack,* as correctly noted by the SBA, we alluded to the propriety of such a refunding scheme as a method of discharging prior obligations and impliedly approved this procedure by upholding the refunding scheme in that case which included an escrow component. 174 W.Va. at 449 n. 15 & 449, 327 S.E.2d at 429 n. 15 & 429. Though we did not directly approve an advance refunding plan in *Winkler,* we did note that W. Va.Code, 18–9D–9 (1993), authorizes the SBA to issue refunding bonds. With regard to the instant case, W. Va.Code, 18–9D–9,[26] not only authorizes the SBA to issue refunding bonds, it also expressly permits the SBA (1) to deposit in trust proceeds of refunding bonds to be used to discharge pre-existing bonds that are not "immediately due and payable" and (2) to invest these proceeds in United States Treasury obligations. Construed in conjunction with our ratification of the SBA's authority to issue refunding bonds, to redeem pre-*Winkler* bonds, the advance refunding scheme proposed by the SBA appears to be consistent with our intent, in *Winkler,* to provide for the redemption of the SBA's prior obligations. In fact, the proposed advance refunding scheme may expedite the redemption of pre-*Winkler* obligations by ensuring that funds

---

**25.** In relevant part, W. Va.Code, 18–9D–9 (1993), provides:

"Such amount of the proceeds of the revenue refunding bonds as shall be sufficient for the payment of the principal, interest and redemption premium, if any, on such outstanding bonds which will not be immediately due and payable shall be deposited in trust, for the sole purpose of making such payments, in a banking institution chosen by the authority [SBA].... Any of the moneys so deposited in trust may, prior to the date on which such moneys will be needed for the payment of principal of, interest and redemption premium, if any, on such outstanding bonds, be invested and reinvested as determined by the authority, in whole or in part: (a) In direct obligations issued by the United States of America or one of its agencies or in direct obligations of the state of West Virginia [or] (b) in obligations unconditionally guaranteed by the United States of America as to principal and interest[.]"

**26.** *See* note 25, *supra,* for the relevant portion of W. Va.Code, 18–9D–9 (1993).

are available, in escrow, for the repayment of these bonds as they come due.

Thus, we find that the SBA may issue refunding bonds in a principal amount larger than the principal amount of pre-*Winkler* bonds to be refunded in order to establish an escrow account for the repayment of those pre-*Winkler* bonds that are not presently due and payable. We caution the SBA, however, that it may issue such additional refunding bonds only in the amount required to establish and maintain the escrow account. In other words, the revenue generated by the excess refunding bonds should be no greater than that amount needed to secure the repayment of the higher interest pre-*Winkler* bonds to be refunded. We limit our holding in this regard to maintain the integrity of our ruling in *Winkler*, which permits the SBA to issue refunding bonds to redeem pre-*Winkler* obligations, but which prohibits the SBA from issuing any new revenue bonds in accordance with the unconstitutional procedure contained in the School Building Authority Act.

## 2. Cash at closing

The SBA also asserts that it should be permitted to issue additional refunding bonds in an amount sufficient to generate cash at closing. In other words, the SBA wishes to realize the majority of the debt service savings from the refunding bonds at the time the bonds are issued rather than over the life of the refunding bonds. If such funds are presently available to the SBA, it states that it could use these moneys to finance new school construction projects.

To arrive at this conclusion, the SBA submits that W. Va.Code, 18–9D–4a (1996),[27] anticipates "aggregate savings" resulting from the refunding of the pre-*Winkler* bonds. Because this section permits these savings to be used for the construction of schools, the SBA contends that any savings it realizes from the Series 1996 refunding bonds should also be applied to this purpose. The SBA

maintains further that the word "aggregate," used in section 18–9D–4a, indicates that the Legislature, in enacting this provision, intended the relevant savings to be "aggregated" and immediately available at the beginning of the refunding process. In order to achieve these "aggregate savings," the SBA argues that it must be allowed to issue refunding bonds in an amount greater than the principal to be refunded and to advance the capitalization of these anticipated future savings.

Additionally, the SBA states that there is no conflict between the provisions of W. Va. Code, 18–9D–9, which limits the manner in which refunding bond proceeds may be expended, and W. Va.Code, 18–9D–4a, which permits the use of aggregate savings for school construction projects. In this regard, the SBA urges this Court to examine the Legislature's intent which is better expressed by the newly enacted section 18–9D–4a (1996) as opposed to the older statute, section 18–9D–9 (1993), which has not been amended since this Court's decision in *Winkler*. Citing *State ex rel. Frazier v. Meadows*, 193 W.Va. 20, 24, 454 S.E.2d 65, 69 (1994) (stating "[c]ourts ... may venture beyond the plain meaning of a statute in the rare instances in which there is a clearly expressed legislative intent to the contrary[,] in which a literal application would defeat or thwart the statutory purpose[,] or in which a literal application of the statute would produce an absurd or unconstitutional result" (citations omitted)).

Lastly, the SBA urges that the refunding scheme it has proposed is remarkably similar to that previously approved by this Court in *Slack*. In *Slack*, this Court permitted the school board to utilize funds previously held for the payment of outstanding bonds for school construction projects, rather than requiring that these funds be used to discharge pre-existing obligations. 174 W.Va. at 443–44, 456–57, 327 S.E.2d at 422–23, 435–37. Thus, the SBA requests this Court to uphold the analogous procedure proposed in the in-

---

27. W.Va.Code, 18–9D–4a (1996) provides:

"Any aggregate savings resulting from the issuance of refunding bonds pursuant to section four [§ 18–9D–4] of this article shall be retained by the school building authority. Any savings shall be utilized solely for the construction and maintenance of schools and may not be used to fund administrative costs of the authority."

stant case whereby revenue generated by refunding bonds would be applied to school construction rather than to pre-existing bond obligations.

Dr. Marockie replies that the SBA cannot issue excess refunding bonds in order to generate cash at closing. In this regard, the respondent relies upon a Georgia Attorney General's Opinion addressing this precise issue: the propriety of using debt service savings to provide cash at closing. 1994 Ga. Op. Att'y Gen. 17, 1994 WL 81295, at *1 (No. 94-8 Feb. 25, 1994). The Georgia Attorney General interpreted a Georgia constitutional provision similar to West Virginia Constitution Article X, Section 4, which limits the amount of debt that the State may incur to that amount necessary to retire a previous debt. In sum, the Georgia Attorney General concluded:

> "the principal amount [of the refunding bonds] should only be increased in the amount necessary to effect the refunding, i.e. reduce the principal and interest requirements over the life of the bonds and pay premiums and any other costs associated with the refunding issue.... Accordingly, all proceeds generated at closing of the refunding issue should be spent on costs of the refunding or used to pay principal, interest and premiums on the refunded debt." *Id.* at *2.

Likewise, Section 4 of Article X of the West Virginia Constitution limits the ability of the State to incur debt to, among other purposes, the redemption of a previous liability of the State. Therefore, the SBA cannot receive anticipated debt service savings as cash at closing because this "windfall" is not within the purposes anticipated by the governing law. *See State ex rel. Dep't of Employment Sec. v. Manchin*, 178 W.Va. 509, 515, 361

S.E.2d 474, 480 (1987) (interpreting redemption language in W. Va. Const. Art. X, Sec. 4).

The respondent also opposes any attempt by the SBA to rely upon *Winkler* as (1) authorizing the issuance of excess refunding bonds and (2) permitting these proceeds to be used for new school construction. In *Winkler*, this Court relied upon W. Va.Code, 18–9D–9 (1993), in determining that the SBA could issue refunding bonds. *See* 189 W.Va. at 765, 434 S.E.2d at 437. However, this statute does not include the construction of new schools among the permissible uses of refunding bond proceeds.[28] In a similar manner, the respondent urges that W. Va. Code, 18–9D–4a, cannot be construed as authorizing the SBA to generate cash at closing through the issuance of excess refunding bonds. The respondent contends that if section 18–9D–4a were interpreted as the SBA perceives, to permit it to issue excess refunding bonds in order to immediately realize aggregate savings, this statute would be unconstitutional because it permits the incurrence of debt for purposes other than the redemption of prior State liabilities and obligates future legislatures to repay the debt service necessary to generate such cash.

Finally, Dr. Marockie notes that while *Winkler* authorizes the SBA to issue refunding bonds to redeem pre-*Winkler* bonds and to reduce the debt service on these obligations, *Winkler* does not permit the SBA to issue refunding bonds to obtain funds for new school construction projects. 189 W.Va. at 764, 434 S.E.2d at 436. *See also County Comm'n of Boone County v. Hill*, 194 W.Va. at 487 n. 6, 460 S.E.2d at 733 n. 6. Moreover, even if the SBA could issue excess refunding bonds, the respondent asserts that this Court's decision in *Slack* suggests that the

---

**28.** W.Va.Code, 18–9D–9 (1993), provides, in relevant part:

"[R]evenue refunding bonds may be issued in an *amount* at the option of the authority [SBA] *sufficient to pay* either in part or in full, together with interest earned on the investment of the proceeds thereof, whether or not at the time of the issuance of the revenue refunding bonds the hereafter mentioned bonds are payable or callable for optional redemption: *(1) The principal of such outstanding bonds; (2) the redemption premium, if any, on such out-*

standing bonds if they are to be redeemed prior to maturity; (3) the interest due and payable on such outstanding bonds to and including the maturity date thereof or the first date upon which said outstanding bonds are to be redeemed, including any interest theretofore accrued and unpaid; and (4) all expenses of the issuance and sale of said revenue refunding bonds, including all necessary financial and legal expenses, and also including the creation of initial debt service reserve funds [.]" (Emphasis added).

SBA could use these funds only for projects funded by the original SBA bonds and that the SBA could not use these proceeds for new projects. *See Slack,* 174 W.Va. at 449, 327 S.E.2d at 429.[29]

We decline to address the parties' statutory and constitutional arguments because our decision of the "cash at closing" debate turns solely upon our interpretation of our prior holding in *Winkler.* In that case, we limited the authority of the SBA to issue refunding bonds to those amounts needed to redeem previously-issued SBA bonds. 189 W.Va. at 764, 434 S.E.2d at 436. We further prohibited the SBA from issuing new revenue bonds in accordance with its prior scheme because we found that method of bond issuance to be unconstitutional. *Id.* In its present attempt to receive cash at closing by issuing refunding bonds in an amount greater than that needed to redeem pre-*Winkler* bonds, the SBA is requesting, in effect, this Court to expand the scope of *Winkler* to an extent that we simply are unwilling to allow. In our prior decision, we expressly recognized that the SBA's issuance of bonds would be invalid pursuant to West Virginia Constitution Article X, Section 4, were it not for our determination that a retroactive application of this ruling would have a devastating effect upon the national credit rating of this State. *See Winkler,* 189 W.Va. at 760, 763–64, 434 S.E.2d at 432, 435–36.

Given our conditional approval of pre-*Winkler* bonds and those bonds necessary to refund them, we are hard-pressed to ascertain how the proposed issuance of excess refunding bonds, which would generate cash at closing purportedly for new school construction projects, is not simply a camouflaged attempt by the SBA to issue the same bonds that we previously prohibited. From our prior holding granting the SBA limited

authority to issue bonds to refund its pre-*Winkler* obligations, it is evident that we did not intend to permit the SBA to utilize proceeds from the refunding bonds to finance new school construction projects. While we applaud the ultimate goal of the SBA to improve the quality of schools in this State, we simply cannot extend the *Winkler* holding beyond our original directive. To do so would abrogate our ruling that the issuance of SBA bonds pursuant to the School Building Authority Act violates West Virginia Constitution Article X, Section 4, and our decision to make this ruling prospective only in an attempt to protect the financial integrity of this State.

Accordingly, we hold that the SBA may not issue bonds alleged to be refunding bonds for the redemption of pre-*Winkler* obligations which have the practical effect of generating cash at closing in order to make immediately available to the SBA the anticipated debt service savings from the so-called refunding bonds. Rather, the authority of the SBA to issue refunding bonds to redeem pre-*Winkler* obligations is specifically limited to encompass only those bonds, the proceeds of which the SBA will use to discharge its pre-existing obligations.

## III.

### CONCLUSION

For the foregoing reasons we hold that the SBA may issue revenue bonds in a principal amount greater than the principal amount of pre-*Winkler* bonds to be refunded in order to establish an escrow account for the repayment of those pre-existing obligations that are not presently due and payable. However, the SBA may issue refunding bonds only in that additional amount required to establish and maintain the aforementioned escrow account. In addition, the SBA may not issue bonds alleged to be refunding bonds for the

---

**29.** Dr. Marockie further argues that the SBA cannot issue additional refunding bonds to obtain cash at closing because federal regulations governing tax-exempt state bonds would treat the excess revenue as the equivalent of a separate bond issue. In this manner, the excess refunding proceeds would be applicable to the purpose for which the refunding bonds were issued (here, the redemption of pre-*Winkler* bonds). *See* 26 U.S.C.

§§ 103, 148 (1994); 26 C.F.R. § 1.148–10 (1996). Additionally, the respondent contends that while the SBA approved a resolution authorizing the Series 1996 refunding bonds, it has not approved the issuance of refunding bonds that would generate cash at closing. Because our decision focuses upon other grounds raised by the parties, we decline to further address these particular arguments.

redemption of pre-*Winkler* obligations which have the practical effect of generating cash at closing in order to make immediately available to the SBA the anticipated debt service savings from the so-called refunding bonds. Accordingly, the writ of mandamus is granted as moulded.

Writ granted as moulded.